38 C.C.P.A. (Patents)
### Application of FRANZ et al.
### No. 5802.

United States Court of Customs and
Patent Appeals.
June 26, 1951.

John H. Sutherland, St. Louis, Mo. (Lloyd P. Shank, Washington, D. C., of counsel), for appellants.

E. L. Reynolds, Washington, D. C., for the Commissioner of Patents.

Before GARRETT, Chief Judge, and JACKSON, O'CONNELL, JOHNSON, and WORLEY, Judges.

WORLEY, Judge.

In this appeal, the record discloses that the Primary Examiner of the United States Patent Office rejected as unpatentable over the prior art claims Nos. 1 to 8, inclusive, those being all of the claims in appellants' application for a patent relating to luminescent targets. On appeal, the Board of Appeals affirmed the decision of the examiner as to claims 1 to 4, inclusive, and claims 7 and 8, but allowed claims 5 and 6. From that decision, appellants here appeal.

The reference relied upon is:

Law       1,543,931       June 30, 1925.
Claims 1 and 7 are deemed to be illustrative and read as follows:

"1. A clay target having an area thereof coated with luminescent pigment having a phosphorescence factor of at least 0.25.

"7. That improvement in the art of nocturnal trap shooting which comprises, providing a clay target having a definitive area coated with luminescent pigment having a phosphorescence factor of at least for a time sufficient that the definitive area of the target directly to an activating source, and immediately projecting the target freely through dark space; said exposure to the activating source being for a time sufficient that the definite area of the target retains a brilliance of at least 100 microlamberts for at least one second after leaving the field of the activating source."

Appellants' invention relates to the application of a luminescent pigment, having a minimum phosphorescent factor of 0.25, to a definitive area of an ordinary clay target for the purpose of making said target visible for trapshooting at night. Immediately prior to its projection from the apparatus propelling such target, the pigment is activated by subjecting it, for not more than four seconds, to a direct source of light, such as a 150 watt incandescent or an ultra violet lamp. The degree of luminosity is governed by both the period of exposure to the light, and the degree and quantity of the composition of said coating, the desired result being a target sufficiently luminous to enable the trapshooter to

readily discern the target and follow its flight in the darkness.

From the patent to Law, we quote as follows: "The * * * invention relates to a method and apparatus for producing a novel, startling and puzzling illusion in connection with shadow dance performances on the stage. It is particularly useful and effective as a closing feature after a dance act of greater or less duration * * *."

It appears that Law coats a special stage drop with zinc sulphite or other luminous paint which becomes "phosphorescent" for a short period of time after being subjected to light. A dancer is placed in front of said drop whereupon "a brilliant white light is thrown upon her and upon adjacent portions of the drop * * *." Immediately thereafter, the lights in the theatre are extinguished and when the special drop is raised that area of the drop which has been illuminated by the spot light appears luminous, while the portion shielded from the light by the dancer's body reveals a non-luminous silhouette of her figure. The illusion appears to be that the dancer herself is "floating upward out of sight."

The Board of Appeals held that claim 1 was illustrative of claims 1, 2, 3, 4, and 8 and that it differed from the disclosure in the Law patent in only two respects; namely, that Law discloses a back drop instead of a clay target, and that he did not specify that the pigment applied to the back drop should have a minimum phosphorescent factor of 0.25, and concluded that such differences would not impart invention to the claims.

The board was of the opinion that no invention was involved in the idea of coating a clay target or any other article with luminous paint so that it could be seen in the dark when Law showed a different article similarly coated for the same purpose.

Appellants readily admit that they were not the first to suggest trapshooting at night; that, as a matter of fact, it was suggested in 1888 by a patent to Jacobs, No. 393,435. Jacobs' target was equipped with several fuses which were to be lighted before the target was discharged from the trap. Neither do appellants contend they are the first to apply a coat of luminescent pigment to an article. They do strongly contend, however, that the principal question here involved is "Whether the prior art made it obvious that the combination of a clay pigeon with a luminescent coating would result in conditions of quick perception and sharp visibility necessary for trap-shooting at night; and specifically whether Appellants' target is inventively different from the Theatrical Illusion disclosed in the Law patent * * *."

In support of their contention, appellants argue that for at least sixty years numerous efforts were made to provide means for trapshooting at night but that none of them were completely successful. The principal attempt was in floodlighting the field from various angles and by incandescent lights of various power. It seems, however, that under such lighting conditions the target traveled about one-tenth of its total trajectory before the eyes were able to see it, and that floodlighting was also found objectionable because of the relatively high cost of installation which was about two thousand dollars. On the other hand, the affidavits made by several seemingly responsible individuals who have been devotees of this particular sport for many years reflect both surprise and a high degree of satisfaction with appellants' luminescent target. They state, in effect, that appellants' target is visible to the eye immediately upon its release from the trap and that it can be easily followed through its entire trajectory; and that even though but a fragment of the target is hit, the "pyrotechnic" result is immediately obvious to the scorer, whereas in ordinary daylight or under floodlighted conditions, such a fragment might not be detected. They also point out that the installation cost of appellants' system is approximately fifty dollars.

It seems to us that the following excerpts from the affidavit of one Joe M. Davison, who appears to have been a consistent devotee of trapshooting for twenty years and who has won honors in that sport,

are quite relevant: "The spectacular effect when luminescent targets are broken also facilitates accurate scoring. The luminescent target travels through space like a ball of fire against a black curtain and, although the contestant may knock no more than a single small chip from the target, such is readily identifiable as a hit, whereas under ordinary conditions, even in daytime, a hit where a single small chip or fragment is knocked from the clay target is some times not seen by the official scorer and is therefore scored as a loss." He further observes that "Affiant has long been familiar with the practice of painting various articles with luminescent paint whereby the same could be seen at night and, although affiant has also for many years been anxious to develop more satisfactory night trap shooting conditions, it was not obvious to him that such conditions could be provided by luminescent targets. When affiant was first introduced to the luminescent target, he wondered why he had not previously thought of it."

The affidavits further reflect that appellants' device enables many to enjoy the sport whose hours of work preclude their participation except at night.

After its consideration of the facts, the Board of Appeals held that " * * * any person would not only have suspected but would have known that a luminescent target would provide even better night shooting conditions than floodlighting and possibly also daylight conditions since it is well known that phosphorescent articles afford a contrast to dark surroundings which are very arresting to the eye."

The question here is a close one. However, based on our examination of the evidence, there is reasonable doubt in our minds that the board was correct in reaching such a conclusion and we feel such doubt should be resolved in favor of appellants.

It is to be noted that the Law patent involves only a painted stage back drop. It discloses no minimum of luminosity. Slowly raising the drop for the purpose of creating an illusion under artificial conditions indoors, in our opinion, is quite remote from that field of sport where a

luminescent pigment of a specific minimum is applied to a clay target so that a trap-shooter, in darkness, can immediately perceive, aim, and discharge his gun at a fast moving luminous object within a few seconds of time.

■ It seems to us that in view of the evidence of record showing the state of the art and the differences between the patent to Law and that present in the field covered by appellants, that invention was required and was present in appellants' concept.

In our opinion, the Law patent, with respect to the art of trapshooting, would not cause one skilled in that art to either suspect or know that luminescent paint on a clay pigeon traveling in the dark at almost bullet speed could be effective.

■ Of course, after the concept of rendering visibility to the target for its quick flight in the dark, the use of a luminescent paint for such purpose was obvious. We have held that the inventive concept, that is, the idea or notion of rendering an operative condition such as is present in the visibility of the target, may properly constitute invention. In re Earle, 102 F.2d 232, 26 C.C.P.A., Patents, 974.

In his brief, the Solicitor for the Patent Office argues that claims 1 to 4 are too broad and that even if it be held that "the particular procedure used by the appellants for producing luminescence involves invention," such claims could not be properly allowed.

■ It is to be noted, however, that the rejection was not based upon the breadth of appellants' claims but, as we read the record, was based only upon the applicability of the patent to Law as a reference. We are, therefore, in this appeal, restricted to that rejection. Since we believe invention was required and is present in appellants' concept, we feel the decision of the Board of Appeals should be and it is hereby reversed.

Reversed.

O'CONNELL, Judge, specially concurring.

The Supreme Court recently set an appropriate new standard for determining whether invention resides in the specification and claims of an applicant for a combination patent. Great Atlantic & Pacific Tea Co. v. Supermarket Corp., 340 U.S. 147, 71 S.Ct. 127. There the Court held that claims for a combination cannot be sustained if their effect in an assembly of old elements is to add nothing new to the stock of useful knowledge but, on the contrary, subtracts from and monopolizes former resources freely available to every person skilled in the art.

In other words, if claims for a combination patent would, in the public interest, do more harm than good, they cannot be allowed. That is not the situation, however, with respect to the auxiliary claims here in issue.

Despite the allowance by the Board of Appeals of claims 5 and 6, the Solicitor for the Patent Office makes the point in his brief that "there is no evidence of commercial use of the alleged invention." Appellants readily admitted at the oral argument and indicated in their brief that the invention defined by claims 5 and 6, without the protection of the auxiliary claims on appeal, is readily susceptible to infringement, and for that reason the claimed combination, in its incomplete and pending patentable status, has not been placed upon the market.

Appellants' action in that regard has been completely within their rights. For example, one practicing appellants' invention "could avoid infringement by omitting to have the pigeons activated individually, although the trap house boy might, by some other routine, impart the same activation."

The doctrine has been thoroughly established by an unmodified line of decisions of this court that an inventor, for the reasonable and advantageous protection of the invention defined by the allowed claims, is entitled to a limited number of additional claims, worded differently or containing elements omitted in other claims, which do not affect the patentability of one claim over another. In re McConnell,

40 F.2d 567. 17 C.C.P.A., Patents, 1139; In re Clark, 97 F.2d 628, 25 C.C.P.A., Patents, 1317; In re Wood, 155 F.2d 547, 33 C.C.P.A., Patents, 984; In re Brogden, 156 F.2d 82, 33 C.C.P.A., Patents, 1181.

The rule of those precedents was reexamined and reaffirmed and other authorities were collected and discussed to the same effect in the recent case of In re Mays, 175 F.2d 570, 36 C.C.P.A., Patents, 1188.

The late Judge Hatfield once remarked that "It is usually the application of old principles to new methods or articles of manufacture that involves patentable subject matter." In re Watter, 147 F.2d 685, 687, 32 C.C.P.A., Patents, 895. Judge Learned Hand likewise observed that "it is the obvious when discovered and put to use that most often proves invention." H. C. White Co. v. Morton E. Converse & Son Co., 2 Cir., 20 F.2d 311, 313; In re Bowden, 183 F.2d 115, 37 C.C.P.A., Patents, 1201.

The Solicitor for the Patent Office seems to advance his argument in the instant case on the basis that appellants by their specification and claims have nowise qualified as inventors of patentable subject matter. The Board of Appeals on that point crossed the Rubicon to the contrary. Hence the solicitor is committed by the record on this appeal to a course of conduct which must definitely conform to the action of the board.

Considered in the light of the patentability of one claim over another, the issue here involved is admittedly a close one. The problem is simplified, however, by the application of the rule hereinbefore cited. The underlying reason for the rule is not only to curb the activities of those engaged in copying patented inventions but also to remove, under the assurance of adequate patent protection, the misgivings which otherwise develop among investors who risk their capital and effort to make inventions available to the public.

The Supreme Court has broad supervisory power over the judgments of the lower federal courts. United States v. Munsingwear, 340 U.S. 36, 40, 71 S.Ct. 104.

However, as a necessary consequence of its decision in Baldwin Co. v. R. S. Howard Co., 256 U.S. 35, 41 S.Ct. 405, 65 L. Ed. 816, the Supreme Court has strictly adhered to a hands-off policy with respect to the judgments of this court relative to patentability. Although there is none to call our power to account, the court should not ignore or reject the vital importance of the cited rule.