40 C.C.P.A.(Patents)

### Application of ARBEIT et al.
### Patent Appeal No. 5937.

United States Court of Customs and Patent Appeals.
June 24, 1953.

Rehearing Denied Sept. 28, 1953.

948

John L. Seymour, New York City (Dale A. Bauer, New York City, of counsel), for appellants.

E. L. Reynolds, Washington, D. C. (S. W. Cochran, Washington, D. C., of counsel), for Commissioner of Patents.

Before GARRETT, Chief Judge, and O'CONNELL, JOHNSON, WORLEY and COLE, Judges.

GARRETT, Chief Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office affirming that of the Primary Examiner finally rejecting several claims of an application, serial No. 69,667, filed January 7, 1949, for "Glass Tank Furnaces." One claim numbered 42 was allowed by the Primary Examiner.

Two claims numbered, respectively, 11 and 12, are listed among the appealed claims, but no reference to them is made in either the reasons of appeal or the brief for appellants before us. The board said concerning them:

"Claims 11 and 12 have been rejected [by the Primary Examiner] as not inclusive of the elected species of subject matter and since that rejection has not been challenged we need not further consider these claims."

Obviously, those claims were improperly included in the list and the appeal as to them will be formally dismissed.

So, the claims actually on appeal are numbered 1, 31, 33, 37, 38, 39, 43, 44, 45 and 46. Claim 38 is dependent upon claim 37, and claims 44, 45 and 46 are dependent upon claim 43. Claim 33 is a method claim; all the others are for apparatus.

We here quote claim Nos. 1, 33, 37 and 43:

"1. In a furnace for the continuous manufacture of vitreous substances, such as glass, in which the material is submitted in successive compartments to the operations of melting, fining and conditioning to the required temperature for its working, electrodes in the fining compartment to cause an electric current to pass through the glass bath, and at least one conduct situated beneath the surface of the glass bath in one compartment to cause the glass to pass from said compartment to the following one, the cross section of said conduct being sufficiently small to ensure to the glass stream, flowing through said conduct as a result of the extraction of glass from the furnace, a speed sufficiently high to prevent any back current through said conduct.

"33. The method of manufacturing glass that includes the steps of melting, fining and working the glass, the glass proceeding from a melting zone to a fining zone to a working zone and being withdrawn from the working zone, fining the glass by Joule effect, and flowing the glass from zone to zone in small, submerged streams impermeable to wandering currents in the zones, said streams constituting the sole connections between the zones.

"37. A glass furnace having a fining zone completely surrounded by walls and separated thereby from all other parts of the furnace, heating means beneath the glass level of the fining zone, the sole connection between said zone and an adjacent part of the furnace consisting of at least one little tube penetrating a wall of the fining zone and extending into said part, said tube being proportioned to the rate of withdrawal of glass from the furnace and providing a minimum flow capable of preventing return flow.

"43. A glass furnace of continuous type having separate glass-containing compartments on one level for glass in different stages of manufacture and discharge means for withdrawing finished glass, and conduit means of small section between said separate compartments, said conduit means having a flow rate related to the flow rate of the discharge means so that the normal operation of the discharge means produces in the conduit means a glass velocity having a minimum in the range from several mm to 1 cm per second."

The following patents were cited as references: Rogers 469,454 Feb. 23, 1892; Voelker 706,283 Aug. 5, 1902; Grauel 1,-552,555 Sept. 8, 1925; Arbeit 1,593,054 July 20, 1926.

Appellants' specification and figure 2 of the drawings, which figure, the board states "illustrates the species of alleged invention that has been elected," disclose a furnace having three separate compartments (also referred to as tanks and zones) that are connected by tubes referred to in some of the claims as "conducts" [1] and in others as "conduits." In figure 2, the tubes are longitudinally arranged and are described as "having a small cross section, preferably cylindrical, inserted into the depth of the walls of the two compartments to be connected."

The manufacturing process evidently requires high degrees of heat in the tanks and the specification teaches "heating by the Joule [2] effect with submerged electrodes, such heating being used alone or else combined with surface heating."

It is explained in the specification that the vitrifiable materials used in the composition of glass are melted in the first tank, or zone, being there reacted "on one another;" that the second tank, or zone, is "for evolving the bubbles so as to refine the glass;" and that the third tank, or zone, is provided "for conditioning the molten glass by cooling it down to the temperature suitable for working it by rolling, gathering, feeder extraction, and so on."

Neither the specification nor the claims specify any degree of heat, but the brief for appellants recites temperatures of "about 1100° to 1200° C." in the third.

Such additional details of structure as are deemed pertinent upon the narrow issue here involved are stated hereinafter.

The following informative statement is quoted from the brief for appellants:

"If one were to measure all the glass furnaces operating in the world, one would probably find that no two such furnaces have the same dimensions. They are not turned out like automobiles with interchangeable parts, but each glass furnace is specially designed to embody the capacity to meet new requirements, the demands of new machines, and to embody lessons learned from old furnaces. An examination of the drawings of over 60 furnaces belonging to a very large company showed no duplicates either in constructional features or in rate of production. The little furnace for making relatively small quantities of optical glass is totally unrelated in size, rate of production, outline, and rate of flow of glass in the furnace to the gigantic plate glass machine whose apparatus is over a half a mile long."

In the specification it is said:

"The object of the present invention consists in providing particular means for ensuring the communication from one compartment of the tank to another compartment. More especially, it relates to means permitting to prevent any movement of the already fined glass containing [sic] in the fining cell or compartment back to the melting compartment, or of the already cooled glass contained in the conditioning compartment back to the fining cell or compartment.

\*    \*    \*    \*    \*    \*

"In a tank furnace for the continuous production of glass comprising one or more fining cells or compartments electrically heated by the Joule effect, there is provided, according to

---

1. Webster's New International Dictionary gives numerous definitions of "conduct." As used in appellants' application, it evidently means such terms as "channel" and "conduit." Webster states it is obsolete in that use.

2. Webster defines joule (after James P. Joule, English Physicist) as "A unit of work or energy which is equal to 10 ergs, and is practically equivalent to the energy expended in one second by an electric current of one ampere in a resistance of one ohm. One *joule* is approximately equal to .738 foot pound, or 0.24 small calorie."

the present invention, for the passage of molten glass from one compartment to the following compartment, one or several conducts each having a cross section sufficiently small to ensure to the glass stream, flowing through it as a result of the extraction of glass from the furnace, a speed sufficiently high to prevent any back current; the conducts through which the glass flows from one compartment to the following one are situated between the level of the glass bath in the former compartment."

While, as has been indicated, many claims are embraced in the appeal, the issue as presented before us actually is limited to the question of whether the subject matter relating to preventing the currents of molten glass from "flowing the wrong way in the furnace" is patentable as that feature is expressed in the appealed claims.

The following statement is taken from the decision of the board:

"* * * Appellants had encountered the difficulty in use of compartmented furnaces that they did not prevent currents of cold glass from the working zone returning to the fining zone and currents of hot glass returning to the melting zone from the fining zone. To overcome the difficulty it is proposed to pass the glass from zone to zone through tubes at a velocity sufficiently high that return flow is prevented. Fig. 2, which illustrates the species of alleged invention that has been elected, shows the melting, fining and working compartments of a furnace connected by small conduits. * * *."

From the foregoing, it is apparent that the *velocity* of the currents of molten glass flowing through the connecting conduits constitutes the element relied upon to prevent the backward flow of such molten glass.

In the brief on behalf of appellants and in the oral argument before us, practically all the emphasis was placed upon claim 43 and the dependent claims 44 and 45, and from our study of the case, we think it logical to give claim 43 first consideration. Unless the velocity feature, as expressed in the claim, is patentable, it is not discerned how such feature properly can be held patentable as it is expressed in any other of the appealed claims.

Before discussing the merits of claim 43, however, there is a question which requires preliminary attention.

As has been stated, one claim stands allowed. It seems to have been "indicated as allowable" by the Primary Examiner. It is presently numbered 42. In stating the reasons for appeal to us, it is alleged that the Board of Appeals erred "In failing to allow claims 43 to 45 in view of the allowance of claim 42," and in both the brief and oral argument before us, argument was made in support of that alleged error.

In the case of In re Waite, 168 F.2d 104, 110, 35 C.C.P.A., Patents, 1117, 1126, we said:

"We apprehend that there is no rule of patent law more firmly settled, nor any which has been more frequently stated, than the rule that this court will not allow rejected claims simply because similar claims may have been allowed by tribunals of the Patent Office in some other application, or even in the particular application under consideration."

It is well that it be borne in mind that this court has no jurisdiction over allowed claims. Consequently, instances requiring our study of such claims are rare. There are instances in which arguments are made that may justify comparing an appealed claim with an allowed claim in order to differentiate or show the absence of pertinent limitations, but even this is a practice not often indulged, and when it is indulged, we are careful to make the reason for such indulgence clear. If we should be led to question the correctness of allowance by the tribunals of the Patent Office of claims in *ex parte* cases, we apprehend that very promptly and with intense earnestness we would be advised that we were exceeding our authority.

The following excerpt from the brief of the Solicitor for the Patent Office is apposite:

"Claim 43 and, of course, the claims dependent thereon (44, 45 and 46) differ from the preceding claims essentially in the fact that they include a 'discharge means' as an element of the combination and specify that the conduit means has a 'flow rate' related to the 'normal' operation of the discharge means to cause a specified range of glass velocity in the conduit. The Board correctly notes * * * that the final clause in the claim is devoid of structure and merely defines a conduit in terms of its 'flow rate.' While the appellants apparently do not quarrel with the examiner's conclusion that the first five lines of the claim are anticipated by Arbeit and Grauel, they strenuously urge that the 'flow rate' clause is of patentable significance.

"One phase of the appellants' argument may be disposed of forthwith, viz., their reliance on the allowance of claim 42 as indicative of inconsistency on the part of the Patent Office. Aside from the impropriety of relying upon other claims allowed by the Office even in the same case, In re Waite 35 C.C. P.A., Patents, 1117, 168 F.2d 104, it should be noted that claim 42 specifies particular flow rates for both the tube entering and the tube leaving the fining zone, in addition to a number of other structural features not in claim 43, thus setting out a *combination* relationship not to be found in any other claim in the case." (Italics quoted.)

We have no authority to reject an appealed claim in an application upon an *allowed* claim in such application, and the converse must be true. If we were to suggest here that the tribunals of the Patent Office erred in granting claim 42, appellant might have just cause for complaint. So, claim 43 must be considered in the light of prior art and upon its own merits, if any, without reference to allowed claim 42.

In his official statement following the appeal to the board, the Primary Examiner said:

"Claim 43 is considered to be unpatentable over Arbeit or Grauel. Disregarding the last five lines of this claim which comprise the functional statement 'said conduit means having a flow rate related * * * cm per second,' the claim defines only compartments on one level, conduit means of small section, and discharge means. Grauel shows on one level, compartments [identified by numerals] 7, 8, 13, conduit means of small section at 10, 12, and discharge means at 16. Arbeit in Fig. 2 shows compartments A, E on one level, conduit means of small section at D, and discharge means at F." The board discussed it as follows:

"Claim 43 includes a plurality of glass containing compartments on one level, means for withdrawing finished glass and conduit means of small section between the separate compartments. The Examiner points out that this subject matter of the claim is clearly shown in Grauel and Arbeit. He holds that the remaining subject matter of the claim is functional and not determinative of patentability. We note that the number and character of the compartments is not stated in this claim. In addition to structure clearly shown to be old, the claim recites merely that the 'normal operation' of the broadly defined furnace produces a flow velocity in the conduit having a designated range as its minimum. Under these circumstances, we fail to find in this statement of operation any positive structure by which the claim may be distinguished from the prior art. The flow rate is not structure." In re Henze, 173 F.2d 997, 36 C.C.P.A., Patents, 1038."

The actual structural features combined in claim 43 are defined in the phraseology reading:

" * * * having *separate glass-containing compartments on one level* for glass in different stages of manufac-

ture and *discharge means* for withdrawing finished glass, and *conduit means of small section between said separate compartments."* (Italics new here.)

It is clear—in fact, it does not seem to be questioned—that the features as thus *broadly defined* are found in the cited prior art in a relationship which constitutes a practical anticipation of them.

Appellant contends, in effect, however, that the claim and its dependent claims are rendered patentable by the following limitation:

"* * * said conduit means having a flow rate related to the flow rate of the discharge means so that the normal operation of the discharge means produces in the conduit means a glass velocity having a minimum in the range from several mm to 1 cm per second."

The last foregoing clause obviously is nothing more than a result obtained from the use of the combination of elements recited in the first clause. In other words, the last clause states the function of the first.

Since the first clause is not patentable because of its conflict with prior art, it is not seen how it can be rendered patentable by stating merely the result obtained from use of the structure, or, to express the idea differently, by reciting the function of the old structure.

We hereinafter discuss this question further. We deem it proper to consider the other claims at this juncture.

Both the Primary Examiner and the board considered all the claims in minute detail, pointed out the purely functional, or resultant limitations expressed in them, and, in rejecting them, applied the same objections that were applied to the functional limitation in claim 43.

As to the physical or structural combinations, the bases of the rejections are epitomized in the reasons of appeal as follows:

"* * * claims 1, 31, and 33 on Grauel and Voelker.

"* * * claim 37 on Grauel in view of either Rogers or Arbeit.

"* * * claim 39 on Arbeit in view of Rogers and Grauel.

"* * * claim 33 as vague and indefinite.

"* * * claim 37 on Arbeit in view of Grauel or Rogers.

"* * * claims 38 and 46 on Grauel or Arbeit in view of Rogers.

"* * * claim 39 on Grauel in view of Rogers."

The material features of the Grauel and Voelker patents are depicted in the statement[3] of the Primary Examiner as follows:

"* * * Grauel shows a melting zone, a working zone and a fining zone heated by Joule effect between the two. The fining zone is in turn divided into three zones [compartments]. The middle fining zone [compartment] is connected to the [first] zone [compartment], which is adjacent the melting zone, solely by a submerged stream * * *. The middle fining zone [compartment] is further connected to [the third] zone [compartment] which is adjacent the working zone by a like stream * * *. There is no clear line of demarcation between a melting zone and a fining zone. Some melting will inherently take place in [the first] zone [compartment], so that essentially Grauel does connect a melting zone to a fining zone by a submerged stream within the definitions of the claim. Likewise, the [third] zone [compartment] is in fact an extention of [the] working zone so that Grauel also connects a working zone to a fining zone by a submerged stream within the definitions of the claim. In short, Grauel shows that it is old to connect three zones by two submerged streams and to heat the glass in the middle zone by Joule effect and whatever the names given to these zones, the method is still old. It is also pointed out that in Grauel because of the small cross

3. We have paraphrased his statement slightly to avoid the use of indicating numerals not easily understandable without the drawings.

section of the streams * * * relative to that of the glass in the rest of the tank they are inherently 'impermeable to wandering currents', to the extent that this latter definition reads on currents of glass. Voelker shows a melting zone * * * connected by channels to a refining zone which is heated by Joule effect between electrodes; said refining zone being connected by passages * * * to a working zone. * * *."

The following is a general description, slightly paraphrased, of the Arbeit and Rogers patents given in the brief of the Patent Office Solicitor:

"The Arbeit patent shows two modifications, that of Figures 1 and 2 being directed to a furnace in which glass is melted in a number of compartments by electric heating sleeves. Fining is carried out in a common chamber and glass is withdrawn from [another] chamber. Glass passes from melting chambers into [the] fining compartment through pipes arranged below the level of the glass. The device of Figures 3 and 4 is similar except that in this instance the fining chamber similarly communicates with the working chambers through pipes.

"The Rogers device, * * * has for its stated object 'to facilitate drawing off the liquid contents of a crucible and controlling the flow therefrom.' It is said to be particularly designed for use in recovering metals from compounds and, thus, would inherently be subjected to temperatures as high, or higher, than those encountered in a glass furnace. Specifically, the patent shows in Figure 1 an inner carbon tube to conduct the molten material, the tube being encased in an insulating material and outer metal jackets * *." The last clause in claim 1 reads:

"* * * the cross section of said conduct being sufficiently small to ensure to the glass stream, flowing through said conduct as a result of the extraction of glass from the furnace, a speed sufficiently high to prevent any back current through said conduct."

Obviously, the foregoing is a purely functional statement and it is the only statement in the claim which *defines* the dimensions of the conduct. The specification is no more definite in that respect than the claim.

Since it was found that the actual structural combination was not patentable over the prior art as shown in the Grauel and Voelker patents, it was held, in effect, that novelty could only be claimed on the basis of the functional statement and that it was not proper to base patentability upon function.

For reasons which will appear later herein, we defer discussion of claims 31 and 33 until we shall have reviewed the other apparatus claims.

In claim 37, the physical feature of the combination which appellant emphasizes is "one little tube penetrating a wall of the fining zone and extending into said [an adjacent] part [of the furnace]."

Of this the Primary Examiner, after directing attention to tubes or pipes disclosed by the Rogers and Arbeit patents, and passages for the flow of molten glass from chamber to chamber disclosed by that of Grauel, held in effect that it would not involve invention to substitute the tubes of Rogers and Arbeit for the passages in Grauel.

The only statement in the claim which relates to the actual dimension of the "little tube" reads, "said tubes being proportioned to the rate of withdrawal of glass from the furnace and providing a minimum flow capable of preventing return flow." Nothing more definite as to dimension is shown in the specification.

Appellants do not question the presence in the Grauel, Rogers, and Arbeit patents of the features pointed to by the Primary Examiner, but contend that no one of those patents "shows the concept of a little tube *proportioned* in the manner described." (Italics ours.)

Upon this point the board said:

"* * * Appellant seems to urge that the several lines of the claim relating to the proportioning of the tube patentably distinguishes the claim from

the references. As these lines are drawn, we fail to find in them sufficient positively defined structure to constitute a patentable limitation. They set forth in effect merely a desirable result which of itself is not basis for the granting of a patent."

As has been stated, claim 38 is dependent upon claim 37 and it was rejected below on the same grounds that were applied to claim 37. The claim states that the little tube "is carbon and preferably graphite," but in view of the state of the prior art shown, it seems clear that patentability may not be based upon the nature of the material which enters into the tube.

The rejection of claims 37 and 38, for the reasons stated by the tribunals of the Patent Office, is approved.

Claim 39 contains the limitation of "at least one little tube" connecting the tanks beneath the glass line, the tube being externally exposed between the tanks. The claim also describes the tube as "being composed of graphite on the inside and refractory material on the outside."

The claim, unlike the others so far discussed, does not rely upon a functional statement to render it patentable. It was rejected by the Primary Examiner as unpatentable (a) over Grauel in view of Rogers, and (b) over Arbeit in view of Rogers.

The board said:

"* * * Of the primary references, Arbeit appears to be the more pertinent and Grauel cumulative. We shall therefore consider only the second stated rejection with respect to which it is the Examiner's view that to substitute for the tubes D of Arbeit the insulation covered carbon tube E of Rogers would be obvious. The Examiner points out that while Rogers describes his carbon tube E as being covered with electrical insulating material rather than refractory material, an ordinary electrical insulating material is also a refractory material. Arbeit shows tubes connecting his separate furnace chamber and electrical heat-ing means M surrounding the conduits for influencing the transmitted glass. In view of this disclosure we do not think that it would be inventive to adopt the expedient of insulating the tubes by the use of refractory material, especially in view of the disclosed insulating covering of Rogers' tube E. This covering in view of the temperatures encountered may be expected to be of a refractory material. We do not attach patentable importance to the use of the graphite lining in the absence of any indicated unusual advantages over the carbon disclosed in Rogers."

In the brief for appellants before us the rejection of claim 39 is discussed as follows:

"In sustaining the rejection of claim 39 * * * the Board says that no invention is involved in substituting the tube e of Rogers for the tube d-e of Arbeit. This ignores the invention and concentrates on incidentals. Fundamentally, the tube e of Rogers is surrounded by a sleeve d of metal and by a non-conducting material d between the tube, the end of e being exposed. Now, the proposal of the Board is not merely to substitute the tube e for Arbeit's tube D, (an impossible task in fact) but also to reconstruct the Rogers tube in the manner proposed * * *. At the temperature of a hot graphite tube filled with molten glass, Rogers' metal parts would melt and the electrical insulation would burn. In this case, as in many others connected with the glass industry, it is a lot easier to propose reconstructions than to propose reconstructions that are capable of being usefully employed."

It is observed that, notwithstanding the quite critical nature of appellants' discussion, there is a failure on their part to point out any feature essential to the support of the broad combination claim 39, which is not found in the combination disclosed by the cited prior art, except that there is no definite showing of a tube "composed of

graphite on the inside and refractory material on the outside." As to this latter limitation, we agree that the particular material named in the claim does not render the claim patentable.

We are not convinced of any error in the rejection of claim 39.

Both apparatus claim 31 and method claim 33 were rejected on the same references as claim 1. The limitation classed as functional by the tribunals of the Patent Office in claim 31 is found in the concluding clause reading, "Each said conduit being a small pipe impermeable to wandering glass currents," and the limitation classed as functional in claim 33 is found in the clause reading, "flowing the glass from zone to zone in small submerged streams inpermeable to wandering currents in the zones."

It is our view that the limitations so appearing in claims 31 and 33, even if classed as functional, are inherently different in status from the functional limitations in claims 1, 37, and 43.

In the latter class of claims the *dimension of the tubes* is a vital structural element and the description of the dimension, in our opinion (which evidently coincides with the opinions of the respective tribunals of the Patent Office), is not sufficient to meet the statutory requirements.

It does not seem to us that the so-called functional statements in claims 31 and 33 have any such importance in the matter of novelty, as the clearly functional statements in the other claims have. Their recital in the claims merely discloses their presence. "Impermeable" is a descriptive term and to meet the claims, of course, impermeable passages are required through which the melted glass may flow, but *impermeability* —not dimension, or velocity of flow—is the important characteristic, and "impermeable" defines itself.

We are not satisfied that claims 31 and 33 were properly rejected on the art cited against them or as being purely functional and they will be allowed.

One other matter requires brief discussion. The prosecution of this application began and ended in the Patent Office and the appeal to this court (notice given November 21, 1951) was taken prior to the effective date, January 1, 1953, of Public Law 593, 82nd Congress 2nd Session, Chap. 950, 66 Stat. 792, approved July 19, 1952, 35 U.S.C.A. § 1 et seq., hereinafter referred to as the Patent Act of 1952.

The brief on behalf of appellants was filed in this court September 30, 1952, and that of the Patent Office Solicitor October 29, 1952. Those dates were subsequent to the approval of the Patent Act of 1952, but prior to its effective date. No reference was made to it in the briefs that were filed before us, but when the case was argued orally March 10, 1953, it was referred to, attention being directed to it and to changes made in Section 4888, Revised Statutes, 35 U.S.C.1946 ed., Sec. 33.

While studying the case following the argument, the court concluded that it was desirable to hear counsel upon the effect, so far as this court's jurisdiction might be affected, of the provision in Sec. 4 of Additional Sections of Patent Act of 1952, Public Law 593, 82nd Cong., 2nd Sess., Ch. 950, 66 Stat. 815, 46 U.S.C.A. preceding section 1, reading:

"* * * It [the Act] shall apply to further proceedings on applications pending on such date [January 1, 1953] and to patents granted on such applications except as otherwise provided. * * *"

Appellants' counsel and the Solicitor of the Patent Office responded to the court's request for further oral argument and presented their views on May 15, 1953, and we have considered the new Act to the extent required in the light of such presentation.

Counsel on both sides seemed to be of opinion that the statute would apply to this court's jurisdiction in some instances, but they disagreed sharply as to it having any application in this case.

The modifications or changes in the language of R.S. § 4888 are embodied in Title 35, U.S.C. § 112, which reads:

"The specification shall contain a written description of the invention,

and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

"The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

"An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."

Counsel for appellant took a position which, in our opinion, would, if adopted, result in establishing the principle that, under the phraseology of the last paragraph, supra, it is proper to look to purely functional limitations expressed in claims for novelty to support patentability.

The Solicitor for the Patent Office, on the other hand, took a position which, in our opinion, if adopted, requires a holding that in cases where purely functional limitations constitute the sole matter relied upon for novelty, the phraseology of the last paragraph, supra, has no application, and the matter is governed by the first and second paragraphs, supra, which repeat in substance the provisions of R.S. § 4888 for a description "in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same".

As a matter of fact, counsel for appellant was understood by us to have argued that a correct interpretation of the Patent laws as they existed before January 1, 1953, would have rendered it unnecessary to include specific details of structure in claims when such details could be ascertained from the specification, and counsel contended in substance that by the last paragraph of Sec. 112, supra, Congress declared the law to be what counsel believes the tribunals of the Patent Office and the courts should have held it to be long, long ago.

Obviously, if the statutes prior to the Patent Act of 1952 should have been construed as counsel for appellant is understood to contend, the tribunals of the Patent Office and all the courts having to do with patent law have been erring probably ever since administration of the patent system authorized by the Constitution began. It would be a waste of time and labor to trace and recite here the history appertaining to this vital principle of law.

In the case of In re Dalton, 188 F.2d 170, 173, 38 C.C.P.A., Patents, 953, 956, this court stated the law as follows:

"* * * Properties, functions, uses, and results that may appear from the defined structure are not definitions of it and may not be solely relied upon to make a claim containing them patentable unless there is a positive setting out of the structure itself *in the claims* which, of course, must be responsible for properties, functions, uses, and results thereof." (Italics ours.)

In the case of In re Jolly, 172 F.2d 566, 569, 36 C.C.P.A., Patents, 825, 829, we said:

"* * * It is true, of course, that where the validity of a claim *which has been granted* is questioned, * * * it frequently becomes proper to interpret the claim by looking to the specification, but where one *seeks a patent,* the statute very definitely requires that he shall particularly point out and *distinctly claim* that which he claims to be his invention or discovery. No citation of authority is necessary in support of the familiar rule that the *claim is the measure of the invention.*" (Italics new here.)

However, even in an infringement case where the validity of a granted patent is

involved, the specification, standing alone, may not always be taken as a sufficient definition of structure.

The decision of the Supreme Court of the United States in the case of General Electric Co.[4] v. Wabash Appliance Corp., 304 U.S. 364, 366, 58 S.Ct. 899, 901, 82 L. Ed. 1402, was, and is, recognized as a lucid and important restatement of certain legal principles appertaining to patents. We quote the following from the decision because it is deemed peculiarly apropos in the case before us now:

"The question before this Court is the validity of the claims in suit. Claim 25, which is typical, reads as follows: '25. A filament for electric incandescent lamps or other devices, composed substantially of tungsten and made up mainly of a number of comparatively large grains of such size and contour as to prevent substantial sagging and offsetting during a normal or commercially useful life for such a lamp or other device.'

"We need not inquire whether Pacz exhibited invention, or whether his product was anticipated. *The claim is invalid on its face. It fails to make a disclosure sufficiently definite to satisfy the requirements of R.S. § 4888, 35 U.S.C. § 33, 35 U.S.C.A. § 33.* That section requires that an applicant for a patent file a written description of his discovery or invention 'in such full, clear, concise, and exact terms as to enable any person skilled in the art or science to which it appertains * * * to make, construct, compound, and use the same; * * * and he shall particularly point out and *distinctly claim the part, improvement, or combination* which he claims as his invention or discovery.' We may assume that Pacz has sufficiently informed those skilled in the art how to make and use his filament. The statute has another command. Recognizing that most inventions represent improvements on some

existing article, process, or machine, and that a description of the invention must in large part set out what is old in order to facilitate the understanding of what is new, Congress requires of the applicant 'a distinct and specific statement of what he claims to be new, and to be his invention.' Merrill v. Yeomans, 94 U.S. 568, 570, 24 L.Ed. 235. Patents, whether basic or for improvements, must comply accurately and precisely with the statutory requirement as to claims of invention or discovery." (Italics supplied.)

In the instant case, counsel for appellants have referred to the difficulty of describing the claimed invention except by stating its function. That difficulty appears to have been alleged as present in the General Electric case, supra, and the Supreme Court said the following concerning it:

"The Circuit Court of Appeals below suggested that 'In view of the difficulty, if not impossibility, of describing adequately a number of microscopic and heterogeneous shapes of crystals, it may be that Pacz made the best disclosure possible * * *.' * * * But Congress requires, for the protection of the public, that the inventor set out a definite limitation of his patent; that condition must be satisfied before the monopoly is granted. The difficulty of making adequate description may have some bearing on the sufficiency of the description attempted, but it cannot justify a claim describing nothing new except perhaps in functional terms. It may be doubted whether one who discovers or invents a product he knows to be new will ever find it impossible to describe some aspect of its novelty."

The foregoing decisions, of course, were rendered before the Patent Act of 1952 was enacted. We think it is perfectly clear that under them and a long line of similar decisions, none of the appealed claims before us, except numbers 31 and 33, proper-

---

**4.** General Electric Company was assignee of the there involved patent which had been issued to Pacz.

ly could have been allowed prior to the passage of that Act, and so, we come to the ultimate question of whether that Act has altered the patent law so that the purely functional limitations in claims 1, 37 (with its dependent claim 38), and 43 (with its dependent claims 44, 45, and 46), may be taken as meeting the statutory requirements of definiteness.

The only changes in phraseology necessary to be considered in connection with that question are those found in the last paragraph of Sec. 112, supra. It seems obvious to us that a construction of that paragraph, such as appellant contends for, would render it wholly inconsistent with the first and second paragraphs which, like former R.S. § 4888, are explicit and *mandatory* in requiring a written description expressed in "full, clear, concise and exact terms" *in the specification,* and so set forth *in the claims.* In the instant case, the descriptions given in appellants' specification are no more definite than the functional statements in the claims, and the latter are not sufficient to meet the requirements of the Act.

It is unnecessary for us to attempt a complete construction of Section 112, supra, at this time. It is sufficient to say that, in our opinion, it has no application to the facts of this case.

The appeal is dismissed as to claims 11 and 12, and the decision of the Board of Appeals is modified. It is affirmed as to claims 1, 37, 38, 39, 43, 44, 45, and 46; and reversed as to claims 31 and 33.

The Notice of Appeal from the decision of the Board of Appeals to this court was filed in the Patent Office December 17, 1951, and the record as certified by the Commissioner of Patents was filed in the office of the Clerk of this court January 31, 1952. The printed copies of the record were filed July 3, 1952.

The record so certified by the Commissioner did not include the official Statement of the Primary Examiner (dated July 10, 1950), made in conformity with the Rules of the Patent Office, following the appeal from his decision to the Board of Appeals, and, on October 9, 1952, the Patent Office Solicitor filed a "Motion to correct diminution of the record" by inserting therein the Primary Examiner's Statement.

It is obvious that the statement was necessary to a consideration of the case on the merits, and appellants should have caused it to be included in the record.

The costs incident to the motion to correct diminution will be taxed to appellants.

Modified.

O'CONNELL, Judge (concurring in part, and dissenting in part).

I agree that the decision of the Board of Appeals should be affirmed as to the rejection of claims 1, 37, 38 and 39, and reversed as to claims 31 and 33.

The disallowance of claims 43, 44, 45 and 46 should likewise be reversed. The gist of the invention, for all furnaces regardless of their shapes and rates of production, is based upon the prevention by the employment of velocity, or rate of flow, as the effective means of preventing back flow of glass from one to another. The patentability of the principle involved was acknowledged in the Patent Office by the allowance of claim 42. As noted in appellants' petition for reconsideration of the board's decision:

"The invention can be clearly stated in terms of velocities as the applicants have done, and as the Examiner has approved, but it is impossible to translate the invention into different terms of 'positive structure'."

It is my conviction that appellants have complied with the requirements of the patent law. This court has established by a line of decisions that an inventor, for the reasonable and advantageous protection of the invention defined by an allowed claim or claims, is entitled to a limited number of additional claims, worded. differently or containing elements allowed in such claims, which do not affect patentability of one claim over another.

The underlying reason for the rule is to curb not only the activities of those engaged in pirating patented inventions but also to remove, under the assurance of

adequate patent protection, the misgivings which otherwise could develop among investors who risk their capital and effort to make inventions available to the public. In re Franz, 190 F.2d 86, 38 C.C.P.A., Patents, 1206, 1211, and authorities therein cited.

It also appears to me that the Patent Office has failed to give appropriate reasons for the rejection of the claims last mentioned. In re Lee, 193 F.2d 186, 39 C.C.P.A., Patents, 752; International Standard Electric Corp. v. Kingsland, 83 U.S.App.D.C. 355, 169 F.2d 890.