55 CCPA

**Application of Hartmut STEPPAN, August Rebenstock and Wilhelm Neugebauer.**

**Patent Appeal No. 7831.**

United States Court of Customs and Patent Appeals.

Dec. 28, 1967.

James E. Bryan, Washington, D. C., for appellants.

Joseph Schimmel, Washington, D. C. (Jack E. Armore, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, and Judges RICH, SMITH, ALMOND, and KIRKPATRICK.[*]

SMITH, Judge.

The principal issues for decision are: (1) whether the compounds defined in appealed claims 17 through 22 would have been obvious to one of ordinary skill in the art within the meaning of 35 U. S.C. § 103; and (2) whether claim 25 is an improper "product-by-process" claim. The Patent Office Board of Appeals[1] affirmed the examiner's rejection of the claims in issue presented in appellants' application.[2]

*The Invention*

Appellants' claimed invention is directed to condensation products of substituted or unsubstituted diphenylamine-4-diazonium salts with formaldehyde. The condensation products, which are polyfunctional diazonium salts, are obtained as phosphates free from metal salts. Appellants' specification admits that certain polyfunctional diazonium salts are known to the prior art. It states:

It is known to the art to prepare polyfunctional diazonium salts by condensing diphenylamine-4-diazonium salts with carbonyl compounds in the presence of mineral acids. In most instances, condensation of diazonium salts with formaldehyde is effected in sulfuric acid of high concentration; hydrochloric acid has also been used as a condensation medium. Isolation of the products produced by condensation in sulfuric acid is accomplished according to a variety of methods, e. g. by precipitation as zinc chloride double salt, as an acid sulfate, or as a diazo sulfonate. The isolation of the condensation products produced in hydrochloric acid has not been specifically described.

Appellants urge that the known methods of isolation of the diazonium condensation products considerably limit the technical application of these compounds.[3]

According to appellants' method, substituted or unsubstituted diphenylamine-4-diazonium salts of acids having a boiling point below 150° C. are condensed with formaldehyde in a phosphoric acid condensation medium. Either before or after condensation, the anions of the original diphenylamine-4-diazonium salts are removed from the reaction mixture. The polyfunctional diazonium phosphates thus formed are precipitated from the reaction mixture, after dilution of the mixture if necessary, by means of organic solvents, in which the phosphates are either insoluble or soluble with some difficulty. After precipitation, the diazonium phosphates are separated by filtration and dried.

Appellants point out that it is not necessary to effect the actual condensation of the diazonium salts with formaldehyde in phosphoric acid to obtain the polyfunctional diphenylamine-4-diazonium phosphates of the invention. Alternatively,

---

[*] Senior District Judge, Eastern District of Pennsylvania, sitting by designation.

[1.] The board consisted of Messrs. Federico and Rosa, Examiners-in-Chief and Stone, Acting Examiner-in-Chief. Mr. Rosa wrote the opinion of the board.

[2.] Serial No. 124,777, filed July 18, 1961 entitled "Method for the Manufacture of Polyfunctional Diazonium Phos-

phates." Claims 1 to 12, 14 to 16, 23, 24, 26 and 27 have been allowed.

[3.] Appellants do not state how or why the applications of these compounds are so limited. Nor do the appellants assert either that particular problems were encountered in making their invention, or that unexpected or peculiar results are derived from it.

the polyfunctional diazonium salts of acids having a boiling point below 150° C., obtained by condensation of diphenylamine-4-diazonium salts with formaldehyde, are dissolved in phosphoric acid and the anions of the dissolved salts are removed from the solution, after dilution if necessary. The formed polyfunctional diazonium phosphates are precipitated by the addition of organic solvents in which the phosphates are either insoluble or soluble with some difficulty and the products are thereafter filtered and dried.

The resultant polyfunctional diazonium salts are acid phosphates which are obtained as solids. Neutral phosphates are obtained by treating solutions of the acids phosphates with an anion exchanger. Upon evaporation of the filtered solution, the neutral phosphates corresponding to the acid polyfunctional diazonium phosphates are isolated. Appellants state that the products prepared according to the invention are useful as dyestuff intermediates.

*Appellants' claims*

Claim 22 is representative of claims 17 to 22 and is drawn to a class of polyfunctional diphenylamine-4-diazonium acid phosphates, where m is 1, or to neutral phosphates where m is 0. The compound is claimed in claim 22 as follows:

22. A compound having the formula

in which n is an integer from 2 through 10, m is a number from 0 to 1, and R, $R_1$, $R_2$, and $R_3$ are selected from the group consisting of hydrogen and alkoxy groups, at least three of R, $R_1$, $R_2$, and $R_3$ being hydrogen.

Claims 17 through 21 vary from claim 22 only as to the presence or absence of alkoxy substituents on the diphenylamine moiety.

*The References*

The rejection of the foregoing claims under 35 U.S.C. § 103 is based upon the disclosures in the following references:

| | | |
|---|---|---|
| May | 2,266,229 | Dec. 16, 1941 |
| Mellan | 3,050,502 | Aug. 21, 1962 |
| | (Filed January 29, 1959) | |
| I. G. Farben (German) | 604,278 | Oct. 18, 1934 |

Saunders, "The Aromatic Diazo Compounds", (1949), page 41.

⸺⸺◆⸺⸺

The May patent relates to a process for forming dihydrogen diazonium phosphate and comprises the steps of adding dihydrogen phosphate salt to an aqueous solution of diazotized ortho aminoazo toluene and separating the solid diazoazo salt thus obtained. May points out that solid stable diazo salts may be used in printing. In such use, May states that it is desirable that such salts should have a "good solubility," so that heavy, as well as light shades, may be obtained. May specifically suggests that one of the important advantages of the dihydrogen *phosphate* salt of diazotized ortho aminoazo toluene is that its solubility exceeds that of the acid *sulfate* salt of diazotized ortho aminoazo toluene, which is in turn more soluble than the zinc *chloride*, cadmium *chloride*, and naphthalene *disulfonic* acid salts of diazotized ortho aminoazo toluene. May further teaches that a solution of certain soluble phosphates used in conjunction with

mineral acids will yield, upon admixture with the diazo solution, a solution having a pH falling within the range in which the diazo compound is stable and from which the desired salt is precipitated.

The Mellan patent relates to the preparation of high molecular weight photosensitive diazo compounds. Mellan teaches that diazonium compounds may react with formaldehyde to form certain high molecular weight products in polymer form. Mellan further describes the preparation of a diazo nitroso compound which is "salted out of solution" as the zinc chloride salt. The salts thus described include a nitroso group bonded to the diphenylamine nitrogen atom and are recovered by precipitation with zinc chloride in the form of zinc chloride double salts.

The German Farben patent discloses the diazotization of 4-amino diphenylamine and its derivatives, including alkoxy substituted compounds, to form corresponding diazonium salts, such as double zinc chloride salts of diarylamine-4-diazonium chloride. Farben further teaches that decomposition can be avoided by performing diazotization in the absence of acids and in the presence of zinc chloride. Farben further teaches that bases of the 4-aminodiaryl amine series are useful for the purpose of dye manufacture.

The particular page of the Saunders article which was specifically referred to by the Board of Appeals discloses that diazo compounds form salts with all strong inorganic acids, as well as a number of organic acids. Saunders points out that the diazo compound must appear as the salt of the acid used in the diazotization reaction, unless some form of internal salt formation occurs. Because two molecules of the acid are required, the choice of acid is generally determined by cost and handling convenience.

### The Section 103 Rejection of Claims 17–22

Appellants have provided us with but a skeletal record which does not contain the necessary materials from which we can determine the exact proceedings prior to the decision of the board. Thus, according to the board, the examiner had rejected claims 17 to 22 as "unpatentable over" Mellan in view of May, Saunders and I. G. Farben. As stated by the board, the examiner's position was that:

\* \* \* varying the anion of an old diazonium salt is a matter of choice and obvious when diazonium phosphates are known and when the anion has little effect on the behavior of the diazonium cation in solution.

The board affirmed that position, stating:

\* \* \* We recognize that no diazonium phosphates having the structure as recited in the appealed claims is disclosed in the prior art, but are of the opinion that the claimed phosphate salts are obvious variations of the salts of the same diphenylamine-4-diazonium compounds conceded by appellants to be known. It is clearly evident from May that phosphate salts of a diazonium compound, albeit not the same as claimed, are more soluble than other salts which are also useful as dyestuff intermediates, and the particular salts claimed, i. e., the phosphates, would thus be obvious when it is desired to utilize a diazonium salt having this particular property. We note, however, that appellants' specification does not allege any special property for the claimed salts attributable to the specific anion as claimed. Appellants' argument is apparently based only on the assertion that the references would not suggest the corresponding phosphate salts. We are, however, of the view that the claimed compounds are obvious and suggested by the art.

Appellants, in their brief, emphasize language in the board's opinion in which the board recognized that no diazonium phosphates having the structure set forth in appealed claims 17–22 are disclosed in the prior art. This argument is directed to an issue under 35 U.S.C. 102 which is not here before us.

As pointed out in Graham v. John Deere Co., 383 U.S. 1, 12, 86 S.Ct. 684, 15 L.Ed. 2d 545 (1966), novelty of the claimed compound over the prior art, 35 U.S.C. § 102, is but one of the explicit requirements for patentability, each of which must be satisfied.

The issue here is obviousness of the claimed invention under 35 U.S.C. § 103. The argument in appellants' brief directed to this issue is that: (1) despite the novelty of the claimed compounds, and (2) despite the fact that process claims for producing these compounds have been allowed in the present application, the board incorrectly held the claimed compounds "obvious nevertheless." This argument does not stand analysis. The inquiry into the "nonobviousness" of the claimed compounds under 35 U.S.C. § 103 is an inquiry separate and distinct from the inquiry made by the examiner into the "nonobviousness" of the claimed process. We therefore regard appellants' argument that process claims have been allowed in the same application as not controlling on the issue of whether the claimed compounds are "nonobvious."

The appellants' remaining arguments likewise are based on an incorrect legal premise as to the nature of the rejection on review. They proceed from a discussion directed to the alleged insufficiencies of *each* of the references considered individually. Thus, appellants urge that Mellan is directed to the preparation of a diazo nitroso compound which is "salted out of solution" as the zinc chloride salt, whereas the claimed invention does not relate to any nitroso compound. Moreover, appellants urge that there is no teaching or suggestion in the Mellan patent of a polyfunctional diazonium phosphate.

Appellants also criticize the teachings of the May patent, urging that it relates only to the diacid diazonium phosphate of ortho aminoazo toluene, a compound which, in appellants' view, bears no relationship to the compounds of the claims on appeal. Appellants urge that the claims on appeal define a condensation product in which at least two of the groups within the brackets of the claims are linked together, while May is not a condensation product. Furthermore, appellants urge that the formula of the compound described in the May patent is significantly different from the structural formulae of the compounds of the claims on appeal.

As to the Saunders' publication and the Farben patent, appellants argue that they contain no method for the production of phosphate salts of polyfunctional diazonium compounds nor indeed any suggestion of such compounds. On this basis, appellants argue Saunders relates only to the preparation of salts other than the polyfunctional diazonium phosphates and that Farben relates to the preparation of compounds obtained as zinc chloride double salts.

In appraising the issue raised under 35 U.S.C. § 103, it is not proper to take such a restricted view of what the references fairly teach one of ordinary skill in the art. In appealing that rejection, it was appellants' burden to convince us that the board erred in affirming the examiner. Appellants have failed to do so. We therefore agree with the board that the claimed phosphate salts would have been obvious within the meaning of 35 U.S.C. 103 in view of the admitted prior art disclosures of known salts of the same diphenylamine–4–diazonium compounds and the May patent.

The factual differences between the claimed compounds and these known compounds reside primarily in the presence of a phosphate substituent in a diphenylamine–4–diazonium compound which had previously been known to contain sulfate, zinc chloride, sulfonate, and hydrochloride substituents. The teachings of May are directed to the desirability of a phosphate salt of an aromatic diazonium compound as a dye intermediate, primarily because of its increased solubility over the corresponding salts such as metal chlorides and acid sulfates. We agree with the board that, given the fair teachings of the May patent and the diphenylamine–4–diazonium compounds

which were known, appellants' invention considered as a whole and here claimed as compounds would, when made, have been obvious to one of ordinary skill in the art.

### The Rejection of Claim 25

Claim 25 stands rejected "as being an improper product-by-process claim." This presents an issue separate and distinct from that which we have found to be dispositive of claims 17–22. Claim 25 defines the following product:

> 25. An acid phosphate of a condensation product of formaldehyde with a salt of a compound selected from the group consisting of a diphenylamine–4–diazonium base and the base substituted in at least one of the positions 2, 3, 2′, 3′, and 4′, by a substituent selected from the group consisting of methyl, ethyl, methoxy, ethoxy, propoxy, isopropoxy, butoxy, isoamyloxy, carboxy and chloro, the acid phosphate having the general formula $ArN_2H_2PO_4.H_3PO_4$, in which $ArN_2$ is the diphenylamine–4–diazonium base condensed with formaldehyde.

As to claim 25, the board stated:

> * * * It is abundantly clear to us that this claim is in fact in product-by-process form since the expressions "An acid phosphate of a *condensation product* of formaldehyde with a salt of a compound * * *" and "in which $ArN_2$ is the diphenylamine–4–diazonium base *condensed* with formaldehyde" are manifestly *process limitations*. Formula claims and product-by-process claims concurrently presented are inconsistent and improper. Note section 706.03(e) Manual of Patent Examining Procedure.[4] [Emphasis and footnote added.]

It is appellants' position that these quoted portions of claim 25 do not constitute process limitations. They urge that the expression "condensation product" merely defines "what the acid phosphate is" and that the equivalent process recitation would be "condensing" not "condensation." Likewise, appellants urge that the claim recitation that the base is "condensed with formaldehyde" merely states what $ArN_2$ is," and that the equivalent process recitation would be "condensing," rather than "condensed." In summary, appellants' position is that claim 25 is nothing more than a different and permissible way of claiming a novel composition of matter without employing the structural formulae set forth in claims 17 to 22.

The solicitor argues that the rejection is based upon the established rule that, where the structural formulae of the chemical compounds are known, as in the case before us, product-by-process claims are improper. In support of his position, the solicitor cites and we have considered In re Bridgeford, 357 F.2d 679, 53 CCPA 1182 (1966), especially footnote 5; In re Lifton, 189 F.2d 261, 38 CCPA 1119 (1951); and In re Shortell, 173 F.2d 993, 36 CCPA 1013 (1949).

The solicitor further responds to appellants' argument by asserting that each of the above quoted portions of the claim is a definition of the product in terms of the reactants which are condensed to form it. In the solicitor's view, the "implications" arising from appellants' choice of the past tense to describe an element of a compound in the claim imports a process limitation into the claim. From this, it is concluded by the solicitor that the claimed product is clearly defined in terms of a process for its production.

---

4. M.P.E.P. 706.03(e) Product by Process
   An article which cannot be described in any other manner, may be claimed by a process of making it. * * * Applicant must, however, make a showing that the product cannot be described except by reference to the process of making it, * * *. Accordingly both product claims described by charac-teristics and product-by-process claims concurrently presented are inconsistent. As a rule, the product-by-process claims should be limited to one, unless it appears that there are material differences between the products produced by the processes recited in the different claims. * * * [Citations omitted.]

On the issue thus raised as to claim 25 we agree with appellants' position. Initially, we note there has been no explicit rejection of this claim by reason of any failure to meet the pertinent requirements of 35 U.S.C. § 112.[5] Tested by the statutory requirement, it seems to be the Patent Office view that claim 25 particularly points out and distinctly claims appellants' invention.

Thus, the issue ·relating to claim 25 turns on the single question of whether the claim is an "improper" claim, presumably on the basis of some "policy" requirements here imposed by the examiner and the board. There is no question that the Patent Office will, in a "proper" case, permit an applicant to claim a product or an article of manufacture by its process of manufacture when certain "conditions" imposed by the Patent Office are met. See In re Bridgeford, supra. The Manual of Patent Examining Procedure (M. P. E. P.) sets forth these "conditions" in section 706.03(e), relied upon by the board.

The rationale for imposing such "conditions" was enunciated, as we noted in *Bridgeford,* supra, as long ago as 1891 in Ex parte Painter, 1891 C.D. 200, 57 O.G. 999. As here applied, the effect of the conditions imposed is that the right to claim 25 is being improperly denied solely because of limitations of the English language.[6] The problem, in essence, is thus one of determining who shall decide how best to state what the invention *is.* By statute, 35 U.S.C. § 112, Congress has placed no limitations on *how* an applicant claims *his invention,* so long as the specification concludes with claims which particularly point out and distinctly claim that invention.

However, we do not consider the stated "policy" dispositive of the rejection here in question. Assuming *arguendo* that the practice of rejecting claims as drawn to an "improper product-by-process" is somehow implicitly permitted by the 1952 Act, without citation or reliance upon a stated statutory basis for the rejection, the dispositive inquiry, it seems to us, is whether the construction of the claim itself shows it to be of the type proscribed by that "policy."

Parsing claim 25, we find first that it is directed to an "acid phosphate." We note that the penultimate word grouping set off by commas advises that the acid phosphate has a general formula $ArN_2H_2$ $PO_4.H_3PO_4$. The ultimate word grouping of the claim states what $ArN_2$ is namely, the diphenylamine–4–diazonium base condensed with formaldehyde. We find nothing inherently improper, nor statutorily proscribed, by the noted word groupings which merely add clarifying language to the definition of an acid phosphate, even though its structural formula is known, as exemplified by claims 17–22.

The claim further limits the invention claimed, i. e., an acid phosphate, to a particular one of that class. As claimed in claim 25, it is the acid phosphate of the condensation product of formaldehyde and a salt of a certain compound. In our view, the term "condensation product," within the context of claim 25, particularly points out and distinctly claims appellants' invention. Finally, the compound whose salt is reacted with formaldehyde is definitely recited as a diphenylamine–4–diazonium base where the base is substituted in at least one of five specified positions by a substituent selected from a group of ten specified substituents. In our view, the language of claim 25 points out, with some precision, that which is applicants' invention.

5. In pertinent part, 35 U.S.C. § 112 provides :
"* * * The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention. * * *"

6. On the basis of the reasoning in *Painter*, supra, a chemical compound could be claimed as a product by the process of making it, if certain conditions were met. Ex parte Fesenmeier, 1922 C.D. 18, 302 O.G. 199.

Thus, we think analysis of claim 25 shows it to be a product claim sufficiently definitive to achieve the purposes for which it was drafted, i. e., to particularly point out and distinctly claim applicants' invention, and not a "product-by-process" claim per se, as we understand the meaning of those terms.

An ancillary matter remains to be determined. It arises from a motion by the solicitor under Rule 13 of this court for certiorari to correct diminution of record to include the examiner's Answer. That motion was based on the stated belief that the Answer was material and necessary to a fair trial of the case on its merits.

Appellants opposed that motion and moved to strike the Commissioner's brief on the basis that the paper submitted by the solicitor which purported to be the examiner's Answer had been altered and thus was not a true copy of the examiner's Answer as filed in the application by the examiner and as received by appellants from the Patent Office during the course of prosecution. It appears that the examiner, in a portion of the Answer in question, had stated that "I. G. Farben teach the conventionality of diazonium phosphate." On that basis, appellants apparently had taken their appeal to the Board of Appeals. However, the copy which was certified here by the Patent Office shows a line drawn through the words "I. G. Farben" and the word "May," obviously referring to the May patent, substituted therefor, It should be noted that, in describing the May reference at another point in his Answer, the examiner had stated:

The patent to May teaches the conventionality of the diazonium phosphate * * *

Upon preliminary consideration of these motions this court denied both without prejudice to a renewal thereof at oral argument, on the basis that neither motion could be disposed of without a consideration of the merits of the case.

In view of the lengthy discussion at oral argument, we assume the parties have renewed both motions. We now deny both motions after a full consideration of the case on its merits. The record before us as presented by appellants has been adequate to permit us to decide the merits of the appeal. We so decide with a distinct word of caution, however, to all counsel who would have this court decide the issues of patentability of a claimed invention on a record where the sole statement of the examiner's rejection must be derived from the board's opinion. Here we have found an adequate basis to decide the case in a statement in the decision of the board. In many instances, however, the opinion of the board may adopt portions of the examiner's Answer in its opinion without reproducing them. It is generally unsatisfactory to omit from the record here any portion of the proceedings below which may be relevant to the appealed issues. The examiner's Answer is normally a most important paper, In re Arbeit, 206 F.2d 947, 41 CCPA 719, (1953).

Accordingly, we affirm the rejection of claims 17–22 and reverse the rejection of claim 25. The solicitor's motion under Rule 13 for certiorari to correct diminution of the record and the appellants' motion to strike the brief for the Commissioner of Patents from the record are denied.

Modified.