**SOLA ELECTRIC CO., Plaintiff,**

v.

**GENERAL ELECTRIC COMPANY, Defendant.**

**GENERAL ELECTRIC COMPANY, Cross-Complainant,**

v.

**SOLA ELECTRIC CO., Cross-Defendant.**

Civ. A. No. 54 C 128.

United States District Court
N. D. Illinois, E. D.
June 22, 1956.

626

Thiess, Olson, Mecklenberger, vonHolst & Coltman, by Albert H. Pendleton and Victor Myer, Chicago, Ill., for plaintiff.

Brown, Jackson, Boettcher & Dienner, by John A. Dienner and C. Lyman Emrich, Jr., Chicago, Ill., and Robert G. Irish, Fort Wayne, Ind., for defendant.

BARNES, Chief Judge.

The writer felt that he should prepare and file a relatively short memorandum supplementary to the formal findings of fact and conclusions of law that he has this day filed. Unfortunately, nothing but the great length of a memorandum that would cover all of the large number of questions considered by counsel warrants the use of the words "relatively short".

Sola Electric Co., the plaintiff, complained of General Electric Company, the defendant, charging infringement of Sola Patent No. 2,346,621, issued August 11, 1944, on an application filed November 13, 1943, and seeking an injunction and an accounting for damages. To the charge of infringement, General Electric Company pleaded the defenses of invalidity of the patent, non-infringement thereof, and unenforceability of the patent because of misuse thereof by the plaintiff. General Electric Company counter-claimed against Sola Electric Co. for a declaratory judgment that Sola Patent No. 2,346,621 is invalid and that General Electric Company has neither infringed nor contributed to infringement thereof. General Electric Company also counterclaimed against Sola Electric, charging infringement by Sola Electric Co. of Brooks Patent No. 2,562,693, issued July 31, 1951, on an application filed December 31, 1948, and owned by General Electric Company and seeking an injunction and an accounting for damages. To this counter-claim Sola Electric Co. pleaded the defense of non-infringement.

It seems to be necessary to quote from Sola Patent No. 2,346,621 at length as follows:

Page 1, column 1, line 1:

"This invention relates to alternating current supply systems for consumption circuits having negative resistance characteristics, more particularly the invention relates to self-regulating systems for supplying alternating current at substantially unity power factor to load devices requiring high starting voltages and having resistance characteristics which vary inversely with the operating current flowing therethrough, and the invention has for an object the provision of improved,

inexpensive and reliable systems of this character.

"While the invention is not limited thereto, it is particularly applicable to and will be described in connection with gaseous discharge tubes, such, for example, as cold cathode fluorescent tubes for lighting purposes. Although cold cathode tubes of the fluorescent type have heretofore been known, the tendency in the lighting art has been toward the use of hot cathode tubes due principally to the difficulties encountered in supplying cold cathode tubes with the necessary high voltage for ignition and thereafter controlling the operating current supplied thereto. * * * "

Page 1, column 2, line 8:

" * * * it is a further object of this invention to provide a supply system for cold cathode type tubes employed for illumination purposes which is compact, inexpensive and reliable, which is self-regulating, and which will supply an optimum operating current to the tube at substantially unity power factor.

"In my prior Patent No. 2,143,-745 issued January 10, 1939, there is described and broadly claimed a constant voltage transformer capable of general application which employs a high reluctance magnetic shunt for effecting a relatively loose coupling between the primary and secondary sides in combination with a resonant circuit in the secondary side for maintaining the secondary voltage substantially constant over a wide range of primary voltages. In my later patent, No. 2,212,198, issued August 20, 1940, an additional current-limiting winding and high reluctance shunt are employed, in cooperation with a resonant circuit and shunt similar to that described in my Patent No. 2,143,745, in order to provide a limited current supply to a tube or similar load device having a negative resistance characteristic.

"In carrying out the present invention, I employ certain of the basic principles set forth in my above referred to patents, but the various elements of my improved systems are differently connected and are so arranged and proportioned as to provide improved, more compact and more economical systems particularly intended for supplying load devices such as cold cathode fluorescent tubes having negative resistance characteristics. Thus I provide, in accordance with one embodiment of my invention, a transformer having primary and secondary windings adapted to be respectively connected to an alternating current source of predetermined frequency and voltage and to a load such as a cold cathode tube having a negative resistance characteristic. The transformer includes a high reluctance shunt magnetically disposed between the windings, which shunt is substantially ineffective when no current flows in the secondary circuit of the transformer, the shunt functioning upon the flow of current in the secondary winding to divert part of the flux produced in the transformer core by the primary and secondary currents and thus to relax the coupling between the windings. Connected in series circuit relation with the secondary winding and the load, I provide a condenser having a capacity reactance so proportioned, relative to circuit constants of the transformer and the load, as to resonate with the secondary winding and provide in the secondary load circuit an oscillatory condition of a series resonant nature. The primary and secondary windings may be electrically sepa-

rate and may be connected together in auto-transformer relation, as desired, and a plurality of secondary windings for supplying separate loads may be associated with a single primary winding, each secondary winding being serially connected with a suitable condenser and load. In the latter case a suitable shunt will of course be magnetically disposed between each secondary winding and the common primary winding.

"For a more complete understanding of my invention, reference should now be had to the drawings in which:

"Fig. 1 illustrates a suitable coil and core structure which may be employed in systems embodying my invention;

"Fig. 2 is a somewhat schematic wiring diagram showing one system of circuit connections which may be used when the core and coil arrangement of Fig. 1 is employed in carrying out my invention;

"Fig. 3 is a somewhat diagrammatic view similar to Fig. 1 but showing another coil and core arrangement;

"Fig. 4 is a circuit diagram of a system embodying my invention and employing the coil and core arrangement of Fig. 3; and

"Fig. 5 is a vector diagram showing the phase relations of the voltage which may exist in the secondary circuit of a system embodying my invention.

"(Note. Figures 1, 2, 3, 4 and 5 are next hereinafter set forth.)

Fig.1.

Fig.2.

Fig.3.

Fig.4.

Fig.5.

"Referring now to Figs. 1 and 2 of the drawings, I have shown my invention as embodied in a system which comprises a coil and core arrangement or transformer 10 including a center core 11 formed of a stack of suitable laminations on the opposite ends of which are mounted a primary winding 12 and a secondary winding 13. In order to provide suitable magnetic return paths for the center core 11, an outer frame is provided having end legs 14 and 15 and upper and lower side legs 16 and 17, the end legs 14 and 15 being preferably notched out as shown to receive the opposite ends of the center core 11. The outer frame is of course formed of a suitable stack of laminations and, as shown, the side legs 16 and 17 are provided with inwardly extend-

ing shunt portions which cooperate with oppositely extending shunt portions on the center core 11 to provide magnetic shunts 18 and 19 between the windings 12 and 13. The shunt portions on the outer frame terminates short of the corresponding shunt portions on the core 11 so as to leave air gaps 22 of predetermined size in the magnetic shunts.

"It will of course be understood that the magnetic shunts 18 and 19 between the windings may be formed entirely by shunt portions which extend inwardly from the outer frame legs, or entirely by shunt portions which extend outwardly from the center core portion 11. In either case, however, a small air gap should be provided in order to provide the desired high reluctance in the shunts. Although the transformer 10 is shown as being of the shell type, it will of course be understood that other core and coil arrangements may be employed so long as a high reluctance shunt magnetically disposed between the windings is provided. As shown, the primary winding 12 is provided with suitable leads 23 and 24 which are adapted to be connected to a suitable source of alternating current, indicated in Fig. 2 by the reference numeral 25, and the secondary winding 13 is provided with suitable connecting leads 26 and 27.

"In Fig. 2 my improved alternating current supply system is shown as applied to a negative resistance load which is indicated somewhat diagrammatically as constituting a cold cathode tube 28 which may be of the fluorescent type known in the art and adopted to be employed for lighting purposes. As shown in Fig. 2, one electrode of the tube 28 is connected to the lead 26 extending from one side of the secondary winding 13 and the other electrode of the tube 28 is connected by a conductor 29 to a condenser 30, the other side of the condenser being connected to the lead 27 which extends from the other side of the secondary winding 13. Thus the secondary winding 13, the condenser 30 and the tube 28 are connected in a closed series circuit.

"As will be more fully explained hereinafter, the circuit constants of the transformer 10, particularly the secondary winding thereof, and the circuit constants of the condenser 30 are so proportioned relative to the circuit constants of the tube 28 as to insure an optimum flow of current through the secondary circuit. Preferably, the circuit constants are so proportioned as to provide an oscillatory condition in the nature of series resonance in the secondary circuit such that the optimum value of current will flow through the load, the value of the current flow being limited by the resonant condition of the secondary circuit and the permeability of the iron core regardless of the negative resistance characteristic of the load. The optimum value of current is maintained substantially constant regardless of variations in the voltage applied to the primary winding 12 from the source 25.

"In the embodiment of the invention shown in Figs. 3 and 4, a pair of secondary windings 31 and 32 is associated with a single primary winding 33. In this embodiment the center core 34 of the transformer 35 is provided with two sets of outwardly extending shunt portions, and the upper and lower legs 38 and 39 of the outer magnetic frame are provided with corresponding sets of inwardly extending shunt portions forming high reluctance magnetic shunts 40 and 41 between the primary winding 33 and each of the secondary windings 31 and 32.

"In this embodiment of the invention, the secondary windings, each of which is intended to supply a separate load circuit, are connected in auto-transformer relation with the primary winding as shown in Fig. 4. Thus the primary winding 33 is con-

nected by means of suitable conductors 42 and 43 to a source of alternating current voltage of predetermined frequency indicated by the reference number 36. One terminal of the secondary winding 32, as shown in Fig. 4, is connected by a suitable conductor 44 to the conductor 42 leading to one side of the primary winding 33, and the other terminal of the secondary winding 32 is connected by a conductor 45 to one terminal of a suitable load device or tube 46, the other terminal of the load device 46 being connected by a conductor 47 to a condenser 48, which in turn is connected to the conductor 43 leading to the other terminal of the primary winding 33. In this manner the primary winding 33 and the secondary winding 32 are connected in auto-transformer relation in series circuit with each other and with the load device or tube 46 and the condenser 48.

"Similarly, the secondary winding 31 is connected at one end by a conductor 50 to the conductor 42 leading to one end of the primary winding 33, and the other end of the secondary winding 31 is connected by means of a conductor 51 to one terminal of a load device or tube 52, the other terminal of the load device being connected through the conductor 53 to a condenser 54, which in turn is connected by a conductor 55 to the conductor 43 leading to the opposite terminal of the primary winding 33.

"It will of course be understood that the transformer 10 of Fig. 1 may have its secondary winding connected in auto-transformer relation to the primary winding, and likewise the transformer 35 of Fig. 3 may have each of its secondary windings connected to its associated condenser and load in electrically insulated relation to the primary. In each case, however, the windings must be properly proportioned for the particular type of connection employed.

"In describing the operation of systems embodying my invention, reference will first be made to the system shown in Figs. 1 and 2. When the primary winding 12 is first connected to the source of energy 25, a magnetic flux flows through the core 11 and the return paths provided by the end and side legs 14, 15, 16 and 17, of the outer frame so as to thread through the secondary winding 13 and induce a voltage therein. Since the cold cathode tube 28 is initially nonconducting the secondary circuit is effectively open circuited and neither the condenser 30 nor the magnetic shunts 18 and 19 will substantially effect the value of the secondary voltage. Due to the high reluctance of the air gaps 22 only a very small amount of the primary flux will flow through the shunts and consequently a secondary voltage substantially equal to the turn-ratio voltage of the transformer 10 will be applied to the tube 28. This turn-ratio voltage is so chosen as to effect breakdown or ignition of tube 28 to render the tube conducting, whereupon a substantial current immediately flows between the electrodes of the tube to produce the desired illumination.

"Immediately upon the flow of current in the secondary circuit the condenser 30 and the magnetic shunts become effective to establish a stable self-regulating condition in the secondary circuit whereby an optimum value of current is established and maintained without regard to the negative impedance characteristics of the tube and without regard to variation of the primary voltage over a substantial predetermined range. The capacity reactance of the condenser 30 is preferably so proportioned relative to the effective inductance of the secondary winding 13 and the impedance characteristics of

the tube 28 upon the flow of current in the secondary circuit, as to produce an oscillatory condition in the nature of series resonance in the secondary circuit. Moreover, as soon as current flow begins in the secondary winding 13, a back magneto-motive force is produced in the section of the core 11 surrounded by the secondary winding which tends to oppose the flow of primary flux therethrough, and accordingly a part of the primary flux is directed through the shunts 18 and 19 so as to reduce or relax the coupling between the primary and secondary windings.

"It is a known characteristic of series resonant circuits that the current flow therein is limited primarily by the resistance in the circuit, the inductive reactance and the capacity reactance in the circuit being substantially equal and opposite. Consequently, the current is substantially in phase with the voltage and substantially unity power factor is obtained. In my improved system the magnetic core 10 and the windings 12 and 13 are so designed as to operate substantially at the maximum flux density of the secondary section of the core with the optimum value of current flowing through the tube and with a series resonant condition in the secondary circuit. It has been found that following initial breakdown of the tube 28 the secondary voltage, instead of dropping as is the case with the usual high leakage reactance transformer employed for igniting such tubes, rises to a higher value at which a stable condition is reached with optimum current flow through the tube, which stable condition is determined by the oscillatory condition of the secondary circuit and the maximum flux density condition of the iron core. If the resistance of the tube 28 tends to decrease, by reason of its negative characteristic, an increase in current is prevented by the fact that the iron of the secondary

circuit is already at its maximum flux density, and consequently the current flow is maintained at the desired optimum value regardless of the negative resistance characteristic. Operation of the iron at its maximum flux density is permissible, since the inductive reactance of the secondary winding is not utilized as a ballast for absorbing the excess voltage in order to limit the voltage drop across the tube.

"As soon as the oscillatory or series resonant condition is established in the secondary circuit, the flux density in the secondary portion of the core 11 rises to a value greater than the flux density in the primary portion. Accordingly, as the flux density in the primary portion varies with variations over a wide range in the voltage applied to the winding 12, the flux density in the secondary core portion will vary only slightly since more or less flux will be by-passed through the magnetic shunts according to the character of the voltage change on the primary. Thus the secondary voltage component applied to the tube 28 remains substantially constant over a wide range of voltage variation on the primary winding, insuring constant illumination by the tube.

"Fig. 5 is a vector diagram illustrating a set of voltage conditions which may occur, with properly selected circuit constants, in the secondary circuit of a supply system embodying my invention. The current, which of course is the same in all parts of the series circuit, may be represented by a vector (not shown) lying along the broken line 60 in Fig. 5. The voltage across the secondary winding is accordingly indicated by the vector $IX_L$, which represents the inductive reactance drop 90° out of phase with respect to the current, and by the same vector $IR_L$ which represents the resistance drop in phase with the current. Similarly, the voltage across the condenser is

indicated by the vector IXc 90° out of phase with the current and 180° out of phase with the voltage $IX_L$. The load, which in this case is a cold cathode tube, has in addition to its pure resistance impedance a substantial capacity reactance, and accordingly the voltage drop across the load is represented by the vector $IR_T$ in phase with the current which is added to the vector $IR_L$, and by the vector $IX_T$ which is added to the vector IXc. In the particular conditions represented in Fig. 5 the sum of the capacity reactance vectors IXc and $IX_T$ is greater than the inductive reactance vector $IX_L$, and accordingly the resultant secondary voltage represented by the vector IZ is slightly out of phase with the current, the current leading the resultant voltage. It will of course be understood that a series resonant condition does not require that the inductive and capacitative reactance of the circuit be exactly equal or that the current and voltage be exactly in phase so as to provide unity power factor. The slightly leading current condition shown in Fig. 5 is well within the range of resonant operation and provides a power factor in the neighborhood of unity. If exact resonance and unity power factor are desired, it is only necessary to correlate the capacity reactances of the condenser and tube so that their sum will be equal to the effective inductive reactance of the secondary winding with the optimum value of current flowing in the secondary circuit.

"Although my invention is not limited to any specific dimension of the iron cores and the windings, or to any specific loads or condensers, but rather contemplates the correlation of the various circuit constants in accordance with the voltage and frequency of the source and the current and voltage rating of the load, the following specifications, which are given merely by way of example,

146 F.Supp.—40½

may be employed in constructing a system of energizing 40 watt cold cathode type fluorescent tubes adopted for optimum operation with a current flow of approximately 120 milliamperes. A core structure such as is shown in Fig. 3 may be provided having a center core 34 composed of a stack of laminations approximately 9/16 inch by 3/8 inch in cross section, with the outer frame legs 38 and 39 about one-half as large in cross section as the center core, the shunts 40 and 41 approximately of the same cross section as the outer frame legs, and the gap in the shunt paths approximately .050 (fifty thousandths) of an inch in width.

"On this core structure may be placed the single primary winding 33, composed of 1000 turns of No. 26 wire, and the two secondary windings 31 and 32 each composed of 4600 turns of No. 32 wire. The secondary windings are connected in autotransformer relation to the primary winding, as shown in Fig. 4, and the condensers 48 and 54, connected as shown in Fig. 4, should have a capacitance of .4 microfarad.

"It was found that the transformer, when thus constructed, produced on open circuit a secondary voltage of approximately 600 volts, somewhat less than the turn-ratio voltage, with the primary winding connected to a 60 cycle source of energy at approximately 118 volts.

"Upon closure of the primary circuit with the 40 watt tubes connected as shown, it was found that the tubes would be ignited and would immediately operate at full brilliance with a current of approximately 108 milliamperes flowing in the secondary circuit. Under these conditions of operation the line power factor was approximately 95% leading, the voltage drop across the tubes being 435 volts, across the condensers approximately 650 volts, and across the secondary windings approximately 660 volts. The magnetic density in

the primary portion of the core was found to be approximately 90,000 lines per square inch.

"Tests for temperature rise under short circuit showed a maximum temperature rise of 26° C. in the primary and 38° C. in the secondaries, and the efficiency of the systems was found to be approximately 82%. When the primary voltage was varied between 106 and 130 volts substantially perfect regulation and constant light output was observed, the maximum variation being less than 1%.

"It will be apparent from the above description and the illustrative example that I have provided a highly efficient, compact and economical transformer and supply system for cold cathode tubes, or similar loads having a negative resistance characteristic, which is self-regulating and which provides optimum operation of the load over a wide range of variation in the supply voltage, and which operates at substantially unity power factor.

"A transformer built in accordance with the above specifications, not only provides more efficient operation and better regulation than has heretofore been obtainable, but in addition represents a great saving in materials weighing only one-third as much as the high-leakage reactance transformers heretofore employed for supplying equivalent tubes or loads.

"While I have shown particular embodiments of my invention, it will be understood, of course, that I do not wish to be limited thereto since many modifications may be made, and, I, therefore, contemplate by the appended claims to cover any such modifications as fall within the true spirit and scope of my invention.

"Having thus described my invention, what I claim and desire to secure by Letters Patent is:"

The plaintiff, in its brief, refers to Claims 1, 7 and 8 as "the three typical claims." Accordingly, of the nine claims in the patent only those three claims will be set forth here, though others may be referred to or quoted from hereafter.

Page 4, column 2, line 39:

"1. In an alternating current supply system; the combination with an alternating current source of predetermined voltage and frequency; of a gaseous discharge tube having a high initial breakdown voltage and a negative impedance operating characteristic; a transformer including magnetic core means having primary and secondary core portions; said portions having primary and secondary windings associated therewith respectively connected across said source and said tube; said windings having a turn ratio such that the open circuit voltage of said secondary winding is sufficient to effect initial breakdown of said tube; said core means including a high reluctance shunt magnetically disposed between said windings for relaxing the coupling therebetween upon the flow of current in said secondary winding; said core means and said secondary winding being so proportioned that said secondary core portion operates at substantially maximum flux density upon the flow of a secondary current corresponding to optimum operation of said tubes; and capacity reactance means in series circuit relation with said tube and said secondary winding; said capacity reactance means; said secondary winding and said tube having impedances at said frequency so proportioned as to effect a stable oscillatory condition of operation in the secondary circuit upon breakdown of said tube thereby to increase the secondary voltage and cause said optimum current flow through said tube; said current being limited by said maximum flux density regardless of said negative impedance characteristic of said tube. * * *"

Page 5, column 2, line 59:

"7. In an alternating current supply system, the combination with an alternating current source of predetermined voltage and frequency, of a gaseous discharge tube having a high initial breakdown voltage and a negative impedance operating characteristic, a transformer including primary and secondary windings respectively connected across said source and said tube and having a turn ratio such that the open circuit voltage of said secondary winding is sufficient to effect initial breakdown of said tube, said transformer including a high reluctance shunt magnetically disposed between said windings for relaxing the coupling therebetween upon the flow of current in said secondary winding, and capacity reactance means connected in series circuit relation with said secondary winding and said tube proportioned to establish upon initial breakdown of said tube an oscillatory condition of a series resonant nature, whereby the operating current flowing in said tube by virtue of the resonant constants of the secondary series circuit substantially saturates the secondary section of said core and is limited to an optimum value regardless of the negative impedance characteristics of said tube, said resonant condition of said secondary circuit being effective to maintain said optimum current flow independently of fluctuations in the voltage of said source over a substantial range.

"8. In an alternating current supply system, the combination with an alternating current source of predetermined voltage and frequency, of a gaseous discharge tube having a high initial breakdown voltage and a negative impedance operating characteristic, a transformer including magnetic core means having primary and secondary windings disposed thereon and respectively connected across said source and said tube and having a turn ratio such that the open circuit voltage of said secondary winding is sufficient to effect initial breakdown of said tube, said core means including a high reluctance shunt magnetically disposed between said windings for relaxing the coupling therebetween upon the flow of current in said secondary winding, said core means and said secondary winding being so proportioned that said secondary core portion operates at substantially maximum flux density upon the flow of a secondary current corresponding to optimum operation of said tube, and capacity reactance means connected in series circuit relation with said secondary winding and said tube, the impedance characteristics of said secondary winding, said condenser and said tube at said frequency being so related as to provide a substantially resonant circuit, whereby said optimum but limited current flow through said tube is obtained at substantially unity power factor."

It used to be the practice in patent infringement suits first to examine and determine the questions of infringement. For various reasons that practice is not now always followed, but it will be followed in the case at bar.

The defendant contends that the patent in suit must be construed to be limited to ballasts for cold cathode lamps; that none of defendant's accused devices operates cold cathode lamps; and that, accordingly, the defendant does not infringe. The plaintiff contends that the patent is not limited to ballasts for cold cathode lamps. The matter is not free from doubt but the court is inclined to the opinion and holds that the patent is not limited as defendant contends.

The patent in suit is confined to a high reactance transformer secondary operative at resonance. This is established by the following evidence: (a) the specification and claims call for series resonant operation of the transformer secondary circuit; (b) the file history discloses

that representations made to obtain the patent assert that the invention depends upon series resonant operation of the transformer secondary circuit; (c) the testimony of the inventor Sola was to the effect, and the exhibits which he produced show, that the invention was based upon series resonant operation; (d) the prior Sola patents Nos. 2,143,745 and 2,-212,198, to which reference is made in the patent in suit for the principles involved, specifically assert the employment of series resonance in operation; and (e) plaintiff's answers to defendant's interrogatories state that series resonance is an essential feature of the invention and of the disclosure and claims of the patent.

One of defendant's experts, whose conclusions seem to the court well founded and accurate, testified that there is no approach to resonance in any of the accused devices. Utilizing the data from inter partes test No. 28, it was calculated that the accused ballast catalog No. 89G324 for rapid start fluorescent lamps, had in the secondary circuit at the supply frequency a ratio of inductive reactance to capacitive reactance varying between .44 at 106 primary volts and .395 at 130 volts, and resonant frequencies varying between 91 and 95½ cycles at the corresponding primary voltages. If this device had operated approximately at resonance in the secondary circuit, the ratio of inductive reactance to capacitive reactance would have been approximately 1.0 and the resonant frequency approximately 60 cycles.

In inter partes test No. 25, capacitance was added to the secondary circuit of catalog No. 89G323 until resonance was reached. Under these conditions, lamp current was 2.55 amperes compared with .431 amperes under normal operating conditions. This test No. 25 was repeated in the court room. Here it was seen that under normal operating conditions lamp current leads the primary voltage, and that when capacitance is added to bring the secondary circuit into resonance, the lamp current rises to about six times normal lamp current causing

the lamps to burn out. This, of course, showed lack of resonance in accused device Catalog No. 89G323.

The accused device Catalog No. 58G262 for operating the 1200-watt UA–4 photochemical lamp does not operate at resonance or near it in the secondary circuit. The ratio of inductive reactance to capacitive reactance, and the resonant frequency of this device were calculated on the data from inter partes test No. 32A. It was found that the device had a ratio of .688 and a resonant frequency of 72.4 cycles at rated supply voltage and frequency.

In the case of the accused device Catalog No. 3303813 for the 400-watt H–1 high pressure mercury vapor lamp, the ratio of inductive reactance to capacitive reactance at the supply voltage and frequency were also calculated. These values were found to be .396 and 95.3, respectively, at 118 primary volts. The oscillograms of lamp current and line voltage showed lamp current to be leading. This evidence shows that the device does not operate at resonance.

Defendant's witnesses summarized the ratios of inductive reactance to capacitive reactance in the three accused devices by the use of a chart. Plaintiff's expert stated in rebuttal that the formula used by the defendant's witnesses to calculate the ratio of inductive reactance to capacitive reactance and to calculate the resonant frequency was not applicable, citing, out of context, as the defendant contends, a printed article by one of defendant's witnesses. The witness in question, however, testified that calculating "apparent reactance" by dividing RMS voltage by RMS current at a particular voltage is justified, and that it makes a very convenient method of determining whether two inductors are approximately alike. Furthermore, the defendant points out a paragraph in the printed article referred to which supports the method defendant's witnesses used to calculate the ratio of inductive reactance to capacitive reactance and the resonant frequency of the accused devices. The court is of the opinion that the de-

fendant's witnesses were warranted in the use of the method which they did use in making the calculations in question.

The plaintiff bases a principal contention that the defendant's three accused devices operate at series resonance upon what plaintiff contends are the admissions implicit in two exhibits prepared by one of defendant's principal experts and offered by the defendant (DX–s 207 and 208). The defendant contends that the exhibits are not properly capable of the construction put upon them by the plaintiff. The court is of the opinion that while the exhibits in question may be capable of the construction put upon them by the plaintiff it is not necessary for the court to explore that side road. The witness under whose direction the exhibits in question were prepared and on the authority of whose testimony they were introduced clearly did not intend them to have the meaning ascribed to them by the plaintiff. He not only did not so testify but, as above stated, he unequivocally testified that there is no approach to resonance in any of the accused devices.

The court finds that no one of the accused devices operates at resonance or near it.

The claims of the patent in suit attribute to the shunts the function of "varying" or "relaxing" the coupling between the primary and secondary windings. The patent specification reads in part (p. 3, col. 1, line 70 to col. 2, line 3):

"Moreover, as soon as current flow begins in the secondary winding 13, a back magneto-motive force is produced in the section of the core 11 surrounded by the secondary winding which tends to oppose the flow of primary flux therethrough, and accordingly a part of the primary flux is directed through the shunts 18 and 19 so as to reduce or relax the coupling between the primary and secondary windings."

The device built by the defendant according to the specification set forth in the patent (p. 4, col. 1, line 38), the commercial devices manufactured by the plaintiff and marked as being made under the patent, and (what is considerably more to the point, since we are considering the question of alleged infringement) the defendant's accused devices all operate with leading current. With leading current in the secondary, the magneto-motive force set up by the secondary core is in a direction to tend to aid or assist and not to oppose the flow of primary flux in the secondary core portion. Accepting for the moment the patentee's idea of relaxed coupling, then this action, instead of tending to reduce or relax the coupling as the above quotation from the patent states, tends to cement the coupling. The claims of the patent claim an action that is contrary to the fact, according to the definition of "relaxed coupling" contained in the specification. Plaintiff's expert, when the above-quoted excerpt from the specification was called to his attention (Tr. 394), admitted it to be incorrect. Nevertheless, Sola, in the Patent Office, distinguished his invention from the prior art by representing that there was a new function in the shunts not performed by shunts of the prior art. See the file history, DX 211, p. 32 lines 15–22 and p. 43 lines 13–23, where the inventor said:

"The magnetic shunts in the applicant's transformer function solely to relax the coupling between the windings as the secondary current and voltage increases so as to permit these quantities to build to the desired optimum values and maintain these values regardless of the voltage fluctuations in the primary circuit."

It is the court's understanding from the evidence that the shunts cannot relax the coupling, that they are merely passive elements that exercise no control whatever, that they are not essential, that the plaintiff manufactures ballasts, marked under the patent in suit, that contain no shunts whatever.

The testimony of Lord, one of defendant's experts, clearly shows that in de-

fendant's accused devices the shunts do not relax the coupling (Tr. 4038, 4040).

At the moment we are dealing only with the question of infringement, and on that question the court is clearly of the opinion that in the defendant's accused devices the shunts do not relax the coupling between the primary and secondary windings, first, because they are mere passive elements, and, second, because defendant's accused devices all operate with leading current and with leading current in the secondary the force set up in the secondary core is in a direction to tend to aid or assist and not to oppose the flow of primary flux in the secondary core portion.

The claims require that "maximum flux density" in the secondary core portion limit the lamp current. The phrase "maximum flux density" does not appear in the original disclosure. See DX 211. Instead, the specification employs the term "maximum permeability". See lines 21 and 29, page 9, and lines 3 and 6, page 10, of the specification as filed. See also, in the claims as originally filed: Claims 3, lines 15 and 16; Claim 4, lines 13 and 14; Claim 5, line 17; Claim 7, line 18; and Claim 10, line 22. It will be observed that the meaning of "maximum permeability" is substantially the opposite of "maximum flux density". Maximum permeability of the iron may be said to be that condition in which a unit of magnetic flow can be produced with minimum effort, whereas, maximum flux density may be said to be a condition of the iron in which the addition of a unit of magnetic flow can be had only at great effort. Incidentally, no supplemental oath was filed, though the amendment changing "maximum permeability" to "maximum flux density" constituted a complete reversal of what appears to be an essential feature of the disclosure.

The specification of the patent gives no definition of the phrase "maximum flux density". Plaintiff's expert defined "maximum flux density" in different ways. Initially, on direct examination, he defined "maximum flux density" as follows (Tr. 131):

"In other words, it is holding substantially all of the flux it can hold. Any additional flux would probably be flowing through the air and possess little in the way of energy."

He later defined the term "maximum" as follows (Tr. 489):

"Q. Well, maximum means the most doesn't it? A. It means, in the case of the invention, the amount necessary to produce the desired results."

These two definitions (and it will be observed that the second of the two is functional) are the only definitions of "maximum flux density" that the plaintiff has given, either in the patent, in answer to interrogatories, or by its expert witness. The court believes that it must assume that the words "maximum flux density" mean what they ordinarily mean, that "maximum" means the greatest amount or highest degree attainable. This seems reasonable in view of the statement (p. 3, col. 2, lines 27–39) of the patent that:

"If the resistance of the tube 28 tends to decrease, by reason of its negative characteristic, an increase in current is prevented by the fact that the iron of the secondary circuit is already at its maximum flux density, and consequently the current flow is maintained at the desired optimum value regardless of the negative resistance characteristic. Operation of the iron at its maximum flux density is permissible, since the inductive reactance of the secondary winding is not utilized as a ballast for absorbing the excess voltage in order to limit the voltage drop across the tube."

This language, and particularly the first part of it, gives one the impression that the iron is so thoroughly saturated that it will receive no further flux. Incidentally, how maximum flux density can limit the current flow and not be utilized as a ballast to limit the voltage drop across the tube is not explained in the patent and has not been explained on the trial.

The control of current flow is variously described in the patent. At one place (p. 2, col. 2, line 39) it is said:

"the value of the current flow being limited by the resonant condition of the secondary circuit and the permeability of the iron core * * *."

Next, the optimum value of current flow is described to the following (p. 3, col. 1, lines 55–59):

" * * * and the magnetic shunts become effective to establish a stable self-regulating condition in the secondary circuit whereby an optimum value of current is established and maintained * * *."

Again, it is stated (p. 3, col. 2, line 23):

" * * * a stable condition is reached with optimum current flow through the tube, which stable condition is determined by the oscillatory condition of the secondary circuit and the maximum flux density condition of the iron core."

Nowhere in the patent specification, or in the testimony, or in the answers to interrogatories, is there anything which substantiates the statement in the claims that the current is limited by the maximum flux density.

In answer to an interrogatory:

"10. A9. d. How does the 'resonant condition of the secondary circuit' limit the lamp current?"

it was stated (Tr. 3642):

"A. The 'resonant condition of the secondary circuit' gives rise to saturation in the secondary portion of the core of the transformer, resulting in a net impedance in the same circuit which limits the lamp current."

Further inquiry through interrogatories as to the meaning of "maximum flux density of the secondary section of the core", produced this definition (Tr. 3656):

"10. A14. b. Define the term 'maximum flux density of the secondary section of the core', as used in the specification. A. The term quoted in this interrogatory has ref-

erence to the magnetic flux condition prevailing under normal operating conditions in the secondary portion of the core of a device built and operated in accordance with the teachings of the patent."

A specific inquiry as to the operation of maximum flux density in limiting the current produced the following (Tr. 3663):

"10. A14. 4. How is an increase in current prevented by the operation of the iron at its 'maximum flux density', if the resistance of the tube tends to decrease? A. In the manner stated in the answer to interrogatory 10.A9.d."

We have completed the circuit and are back where we started. We have learned that the lamp current is limited by the "net impedance in the circuit." "Net impedance in the circuit" is obviously not "maximum flux density"; accordingly, it appears that maximum flux density does not limit the flow of current regardless of said negative impedance characteristics of the tube.

Upon comparing the actual values of flux density, alleged by plaintiff to be "maximum flux density", in data supplied by plaintiff, it is found that maximum flux density varies greatly. See the bar chart, DX 142. The figures of flux density, claimed by the plaintiff to conform to the limitation maximum flux density vary from 97,000 to 130,000. It is evident that "maximum" does not mean maximum. On the contrary, it means the amount required to get the result, and there is no indication of the value to be employed or of how to find out what it is.

To secure the grant of a patent, Sola urged the distinction over the prior art that, in his device, maximum flux density was relied upon to control the lamp current to the desired or optimum value. In the file history, applicant said (DX 211, page 43, lines 23 to 30):

"In applicant's system the transformer is so designed relative to the gaseous discharge tube and the se-

ries condenser that the desired voltages and currents are not only built up, but in addition the secondary portion of the transformer core operates at substantially its *maximum flux density* with predetermined optimum current flowing in the secondary and *thus limits the flow through the tube of the current* produced by the oscillatory or resonant operation."

Again, on page 47, lines 16 to 22, the applicant urged:

"Each of the claims now recites the combination of the tube, transformer and condenser and sets forth that the secondary core portion of the transformer operates at substantially its *maximum flux density* when the secondary current flow produced by the oscillatory or resonant condition of the secondary circuit elements is at the optimum value desired for operation of the tube."

Finally, on page 48, lines 10 to 18, applicant pointed out:

"Each of the claims 3 to 10 and 13 brings out the special design of the applicant's system, whereby the turns ratio voltage effects breakdown of the tube, the coupling between the windings of the transformer is relaxed to permit resonance in the secondary circuit containing the tube and the condenser, the resonant *current is limited by the maximum flux density* of the secondary core portion of the transformer regardless of the negative impedance characteristics of the tube. None of the references discloses or suggests such systems."

By all of the above, applicant urged the limitation as to maximum flux density controlling the current as an essential limitation in each of the claims. And the claims themselves depend on the concept of maximum flux density limiting the flow of the current through the lamp.

(It is acknowledged that some of the foregoing observations are beside the question as to whether in the accused devices "maximum flux density" in the secondary section of the core limits the current, but they throw light on the confusion that apparently existed in the mind of the patentee,—a confusion that has contributed to the length of the present study. The trial lasted 33 days and the briefs cover 576 pages.)

Noting again that at the moment we are dealing only with the question of infringement, we come to the consideration of the testimony of one of defendant's experts, Lord, to whom reference has heretofore been made. Lord testified that the limitation of the claims, that "maximum flux density" in the secondary core portion limits the lamp current, does not apply to any of the accused devices (Tr. 4030, 4031, 4033, 4034, 4035, 4037, 4038, 4041, 4045, 4051). The court is of the opinion that he was correct in that conclusion.

Defendant's accused device 89G323 does not have "minimum flux density" in its secondary core portion.

Claims 1 through 6, inclusive, and 8 and 9 of the patent in suit call for operation of the secondary core portion of the transformer at maximum flux density, while lines 20 to 24 of Claim 7 state:

" * * * whereby the operating current flowing in said tube by virtue of the resonant constants of the secondary series circuit substantially saturates the secondary section of said core * * * "

The device 89G323 uses iron with a saturation density of 130,000 lines per square inch, while the secondary core portion is operated at 97,000 lines per square inch (Tr. 3442). The device in question utilizes a bridged gap in the secondary core portion in accordance with Brooks patent 2,562,693 (Tr. 3175–77). The secondary core portion of said device, due to the bridged gap in the secondary core portion, does not operate at or near maximum flux density of the iron.

In response to a request from plaintiff's counsel, defense's witness Lord furnished magnetization curves for the basic

core material and the core material with the bridged gap as used in device 89G323 (DX 224). Reference to this exhibit shows that the 97,000 lines per square inch flux density in the secondary core portion of said device is well below the maximum flux density, or saturation density, of the core material used.

An exhibit (DX 142) shows the relative flux density of the secondary core portion of the device 89G323 compared with other devices of both defendant and plaintiff introduced at the trial. It is there seen that the operating density of the secondary core portion of this accused device is substantially lower than any of the other devices referred to.

The testimony of the witnesses and the exhibits show that the device 89G323, due to the action of the bridged gap, does not operate with the iron in its secondary core portion either at maximum flux density or substantially saturated.

All of the claims of the patent in suit, with the exception of Claim 4, require that the transformer windings have a turns ratio such that the open circuit voltage of the secondary winding is sufficient to effect initial breakdown of the tube.

Accused device 89G323 operates two rapid start fluorescent lamps in series, the starting of the two lamps being sequential by virtue of the shunting capacitor connected across one lamp. The rapid start fluorescent lamp has cathodes continuously heated by separate cathode heating windings on the transformer. Two things are required for starting the rapid start lamp in addition to the terminal voltage of the secondary: cathode heating and a nearby metal plate (Tr. 1207). In the normal operation of the device 89G323 with rapid start lamps, secondary terminal voltage is applied to the lamp at the same instant as the cathode heating voltage. However, the first lamp does not start until its cathodes have become sufficiently heated and the second shunted lamp does not start until the first has started; this contrasts with the operation of cold cathode lamps where starting occurs instantly upon the

application of turns ratio voltage (Tr. 1691–93). The operation of rapid start fluorescent lamps from the 89G323 ballast involves three separate steps, one after the other: cathode heating, followed by starting of one lamp after an interval of time and then starting of the second lamp. The preheated cathodes in the rapid start lamp reduce the open circuit voltage required for starting (Tr. 3177). The turns ratio voltage of the 89G323 device is only sufficient to strike the lamp after the cathodes have been heated and with the aid of the metal plate as proper potential, and, further, it strikes only one lamp at a time (Tr. 4190).

Accused device 89G323 has an entirely different combination of elements from those disclosed in the specific example and those recited in the claims of the patent in suit. In the device of the patent, the induced voltage in the secondary winding, i. e., turns ratio voltage, alone is sufficient to break down the cold cathode tube. In the accused 89G323 device, where two lamps are sequentially started, two additional elements are added to the combination, namely, cathode heating windings on the transformer (which heat the lamp cathodes until the turns ratio voltage which is already available will start the lamp), and the nearby metal plate (which also reduces the voltage which would otherwise be needed for starting). Due to the difference in the characteristics of the lamps involved, a ballast for operating two 48-inch start lamps would not be able to start two 48-inch cold cathode lamps, since insufficient turns ratio voltage is provided. Furthermore, as indicated, the accused device 89G323 starts two rapid start fluorescent lamps in sequence. Thus, even with preheating of the lamp cathodes and the nearby metal plate, the open circuit or turns ratio voltage of the transformer will not start both lamps at once, but, on the contrary, will only start one lamp after the other lamp has started. Nothing of this sort is contemplated by the patent in suit which, in Figs. 3 and 4, discloses a ballast for op-

erating two lamps from parallel circuits, both lamps starting instantaneously and simultaneously.

Another distinctive feature, neither disclosed nor claimed in the patent in suit, is found in the accused device 89G323,— sequential starting of the two lamps operated in series. This device is a completely different combination of elements from anything contemplated by the patent.

The court finds that in accused device 89G323 turns ratio voltage does not "effect initial breakdown" of the tube as required by the claims.

In accused device 58G262 for operating the 1200-watt UA–4 lamp, a starting switch is utilized with the transformer in order to start the lamp, the switch momentarily short-circuiting the lamp and, on opening, causing an inductive kick of voltage sufficient to strike the arc.

Defense witness Thayer testified, with regard to the UA–4 lamp, that (Tr. 1343):

"* * * This lamp operates from 240 volts open circuit and will not start without the starting kick, the peak voltage that is furnished by the collapse of flux in a series inductance when a starting switch which is short-circuited across the lamp opens up."

And, further, with regard to the accused device 58G262 (Tr. 1697–8):

"Q. I call your attention to the chart of General Electric number 58G262, which is in evidence as Plaintiff's Exhibit 2–A, particularly the lower figure, circuit figure, and ask you whether that corresponds to the actual operation of the lamp by that ballast. A. No. That lamp will not start without the inductive kick of a starting switch which is short-circuited across the lamp at the beginning of the operation."

Defense witness Kronmiller testified similarly on cross-examination with regard to the inadequacy of the secondary open circuit turns ratio voltage of the 58G262 device and the function of the starting switch (Tr. 2996).

A third defense witness, Lord, also testified that the turns ratio or open circuit voltage of the 58G262 device is not sufficient to strike the lamp (Tr. 4189).

The testimony of these witnesses shows and the court holds that the accused device 58G262 does not provide sufficient turns ratio voltage to start the UA–4 lamp as required by the claims of the patent in suit, and that an auxiliary switch is used to effect starting, a mode of operation not contemplated by Sola, who discloses and claims instant starting from turns ratio or open circuit voltage alone.

Accused device 3303813 is designed for operating the 400-watt H–1 high pressure mercury vapor lamp. This lamp has a small starting electrode mounted adjacent one of the cathodes, connected to the other cathode through a resistor (Tr. 1320). Defense witness Thayer described the starting of the 400-watt mercury vapor lamp by the 3303813 ballast. By use of a sketch (DX 85), he explained that when the secondary voltage of the ballast is impressed across the lamp the first action that takes place is an auxiliary discharge between one of the main electrodes and the starting electrode. The gap between the starting electrode and the main electrode breaks down first and the ionization in the tube produced by this auxiliary discharge causes the main gap between the two main electrodes to break down (Tr. 1693–96). Defense witness Kronmiller testified on cross-examination that the starting of the 400-watt H–1 lamp by the 3303813 ballast is a two-stage operation, the first stage being the striking of the auxiliary arc between the starting electrode and one main electrode, and the second stage being the striking of the main arc between the main electrodes, the main arc not being struck directly by the turns ratio voltage (Tr. 3001–02). Defense witness Lord testified that the open circuit voltage of 3303813 ballast is inadequate to strike the main arc and that it first must strike the auxiliary arc, which then pro-

vides ionization allowing the open circuit voltage to strike the main arc (Tr. 4190). He contrasted the starting of mercury vapor lamps, in which the full turns ratio voltage is available initially across the main gap but does not break it down until the auxiliary gap has broken down thereby generating ionization in the tube lowering its breakdown voltage, with the cold cathode lamp in which the lamp starts immediately (Tr. 4351–52).

The testimony of these three witnesses shows and the court holds that the accused device No. 3303813 does not start the 400-watt H–1 high pressure mercury vapor lamp with turns ratio voltage alone, but, on the contrary, starts the lamp in two steps by virtue of the starting electrode in the lamp, in contrast with the operation of the cold cathode lamp contemplated by the patent in suit in which the arc is struck immediately by turns ratio voltage only.

The testimony shows and the court holds that none of the accused devices 89G323, 58G262, and 3303813 starts its associated lamp with turns ratio voltage alone as taught by the specification and as required by the claims of the patent in suit.

■ The court is of the opinion that the Sola patent in suit No. 2,346,621 is invalid because of anticipation by certain British and American patents; that it involves no invention over certain other American and British patents; that it involves no invention over the prior knowledge of the art as disclosed in certain devices, referred to in the evidence; that the invention of Sola patent 2,346,-621 was known and used by others prior to Sola's invention and more than one year prior to his filing date; and was on sale and in public use more than one year prior to the Sola application. The details of these matters are set forth in the findings of fact and conclusions of law this day filed, so that it is unnecessary to lengthen this memorandum by repetition here.

■ The defendant contends that the patentee Sola, in his claims, painstakingly recites what was old in the art and then uses conveniently functional language at the exact point of novelty, in violation of the rule laid down in General Electric Co. v. Wabash Appliance Corp., 304 U. S. 364, 58 S.Ct. 899, 82 L. Ed. 1402, and other like cases, and that, accordingly each and all of the claims are invalid on their faces. It is certainly true that the system of the Sola patent in suit is old, element for element, and the elements are old in combination, as is apparent from the prior art cited by the Patent Office and additional prior art cited by the defendant. See Wiegand patent No. 1,930,116, and particularly Figure 6 of that patent; Francis British patent No. 491,070; Karash patent No. 2,358,810; and Short patent No. 2,334,587, all of which exhibit the same combination of the same old elements. The invention is alleged to be in the proportioning of these elements relative to each other. But that proportioning, instead of being set forth in mathematical ratios, or even in dimension of the parts, is stated in terms of function or result.

In Claim 1, which was one of the typical claims selected by the plaintiff, the positively recited elements of the claim are: the alternating current source, the gaseous discharge tube, the transformer with core means comprising primary and secondary core portions, with corresponding windings and with magnetic shunts. All of that is old in the prior art. Beginning at line 56 of the claim, everything that follows is a statement of functions intended to distinguish the Sola invention from the old combination. Beginning at that line, Claim 1 says:

"said core means and said secondary winding being *so proportioned* that said secondary core portion operates at substantially maximum flux density upon the flow of a secondary current corresponding to optimum operation of said tubes * * *; said capacity reactance means, said

secondary winding and said tube having impedances at said frequency *so proportioned* as to effect a stable oscillatory condition of operation in the secondary circuit upon breakdown of said tube thereby to increase the secondary voltage and cause said optimum current flow through said tube; * * *"

It is noted that this claim requires two *proportionings*, which proportionings are not defined or stated in the claim except by reference to the functions which are supposed to be attained. Neither are said proportionings defined or described in the specification.

Each of the nine claims contains functional language at the exact point of novelty. Beginning at line 15, Claim 2 says:

"said shunt and said secondary winding being *so proportioned* and arranged relative to said condenser and said tube as to establish in said secondary circuit a stable oscillatory condition of a series resonant nature when said primary winding is energized from said source to produce a current flow in the secondary circuit corresponding to optimum operation of said tube,"

Beginning at line 44, Claim 3 reads:

"the respective impedance characteristics of said secondary winding, said condenser and said tube at the frequency of energization of said primary winding and the coupling provided by said shunt being *so proportioned* that a substantially series resonant condition is effected in said secondary circuit * * *."

Beginning with line 70, Claim 4 states:

"said shunt and said secondary winding being *so proportioned* and arranged relative to said condenser and said tube as to provide in the secondary circuit an oscillatory operating condition at said frequency in the neighborhood of series resonance thereby to produce in said secondary circuit a current flow corres-

ponding to optimum operation of said tube,"

Beginning at line 23, Claim 5 reads:

"said core means and said secondary winding being *so proportioned* that said secondary core portion operates at substantially maximum flux density upon the flow of a secondary current corresponding to optimum operation of said tube,"

Beginning at line 48, Claim 6 states:

"capacity reactance means connected in series circuit relation with said secondary winding and said tube *proportioned* to establish upon initial breakdown of said tube an oscillatory condition of a series resonant nature, * * *"

Beginning at line 73, Claim 7 reads:

"capacity reactance means connected in series circuit relation with said secondary winding and said tube *proportioned* to establish upon initial breakdown of said tube an oscillatory condition of series resonant nature, * * *"

Beginning at line 29, Claim 8 says:

"said core means and said secondary winding being *so proportioned* that said secondary core portion operates at substantially maximum flux density upon the flow of a secondary current corresponding to optimum operation of said tube, * * *."

Beginning at line 22, Claim 9 states:

"said condenser having an impedance *so proportioned* relative to the impedance of said secondary winding with a small current flowing therein at said frequency as to provide an oscillatory condition in the nature of series resonance, * * *"

The court is clearly of the opinion that each of the nine claims of the Sola patent violates the rule laid down in General Electric Co. v. Wabash Appliance Corp., supra, and Halliburton Oil Well Cementing Co. v. Walker, 329 U.S. 1, 67 S.Ct. 6, 91 L.Ed. 3. The question which the court must answer is whether or not the claims are saved by the provisions

of the Patent Act of 1952, particularly the last paragraph of Section 112, 35 U.S.C. That section reads as follows:

"The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

"The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

"An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."

The first two paragraphs of the above section come from Section 33 of the old statute without substantial change.

The cases which have considered this amendment are few. The only case which the writer has been able to find relating to the question at hand is the Application of Arbeit, 206 F.2d 947, 41 C.C.P.A., Patents, 719. In that case, 206 F.2d at page 957, the court, by Chief Judge Garrett, after referring to the case of General Electric Co. v. Wabash Appliance Corp., supra, and other like cases, said:

"The foregoing decisions, of course, were rendered before the Patent Act of 1952 was enacted. We think it is perfectly clear that under them and a long line of similar decisions, none of the appealed claims before us, except numbers 31 and 33, properly could have been allowed prior to the passage of that Act, and

so, we come to the ultimate question of whether that Act has altered the patent law so that the purely functional limitations in claims 1, 37 (with its dependent claim 38), and 43 (with its dependent claims 44, 45, and 46), may be taken as meeting the statutory requirements of definiteness.

"The only changes in phraseology necessary to be considered in connection with that question are those found in the last paragraph of Sec. 112, supra. It seems obvious to us that a construction of that paragraph, such as appellant contends for, would render it wholly inconsistent with the first and second paragraphs which, like former R.S. § 4888, are explicit and *mandatory* in requiring a written description expressed in 'full, clear, concise and exact terms' *in the specification*, and so set forth *in the claims*. In the instant case, the descriptions given in appellants' specification are no more definite than the functional statements in the claims, and the latter are not sufficient to meet the requirements of the Act.

"It is unnecessary for us to attempt a complete construction of Section 112, supra, at this time. It is sufficient to say that, in our opinion, it has no application to the facts of this case."

This court agrees with Chief Judge Garrett. All three paragraphs of Section 112 must be read and construed together, and each of the paragraphs must be given effect. As Judge Garrett said in that case it may be said in this case, "in the instant case, the descriptions given in appellants' [plaintiff's] specification are no more definite than the functional statements in the claims, and the latter are not sufficient to meet the requirements of the Act." If one were to speculate as to the effect which may, under proper circumstances, be given to the third paragraph of Section 112, perhaps one would be permitted to suggest that it is designed to cover such a case as Mr. Justice Reed had in mind when, in

General Electric Co. v. Wabash Appliance Corp., 304 U.S. 364, at page 371, 58 S.Ct. 899, at page 903, he said:

"A limited use of terms of effect or result, which accurately define the essential qualities of a product to one skilled in the art, may in some instances be permissible and even desirable, but a characteristic essential to novelty may not be distinguished from the old art solely by its tendency to remedy the problems in the art met by the patent."

But even in such a case as that, it must be borne in mind that while the paragraph in question permits an element in a claim for a combination to be expressed as a means or step for performing a specified function without the recital of structure, material or acts in support thereof the remainder of the paragraph requires that "and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification." Giving effect to all three paragraphs of new Section 112, it would seem that the specification should "contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same", should "set forth the best mode contemplated by the inventor of carrying out his invention", should "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention," and that while "an element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof" nevertheless the structure, material or acts must have been described in the specification, otherwise, it will be impossible to construe the claim as new Section 112 provides.

In the Sola patent in suit, neither the specification nor any one of the claims describes otherwise than by function the *proportionings* contemplated of the elements old in the art. The court is, accordingly, of the opinion that each and all of the claims are invalid.

■ One of the principal contentions of the defendant is that the plaintiff has misused its patent. Its thesis is as follows: The patent claims cover a system including the following elements in combination: (a) An alternating current source of predetermined voltage and frequency; (b) a gaseous discharge tube (lamp); (c) a transformer having a core with primary and secondary windings and a shunt between them; and (d) a condenser. Three of the elements, that is to say, the lamp, the condenser and the secondary core portion and winding of the transformer are said to be so proportioned as to give "series resonance" in the secondary or lamp circuit. This condition of "series resonance" is disclosed as characteristic of the invention; it can only exist in a resonant system. The lamp is specified as a component of the resonant system and is, therefore, an active essential element of the disclosed combination. It cannot be regarded as a mere environmental element or as a transient medium. Neither the plaintiff nor the other ballast manufacturers that it has licensed sell the patented system. Neither do they sell lamps. Both plaintiff and its licensees sell ballasts not covered by the patent in suit, said ballasts being sold with an implied license to their customers to use the patented system without charge. Accordingly, the patent is being employed and has been employed in suppressing competition is unpatented ballasts. This, the defendant contends, is a violation of the doctrine announced in Mercoid Corp. v. Mid-Continent Investment Company, 1944, 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376, and Mercoid Corp. v. Minneapolis-Honeywell Regulator Co., 320 U.S. 680, 64 S.Ct. 278, 88 L.Ed. 396, and like cases. The court is strongly inclined to think that such conduct is violative of the doctrine of those cases. The plaintiff, on the other hand, says that the Congress of the United States has chang-

ed the law of the Mercoid cases by the following statute, effective Jan. 1, 1953, Sec. 1, c. 950, 66 Stat. 811, Sec. 271(d), Title 35 U.S.Code:

"(a) Except as otherwise provided in this title, whoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent.

"(b) Whoever actively induces infringement of a patent shall be liable as an infringer.

"(c) Whoever sells a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

"(d) No patent owner otherwise entitled to relief for infringement or contributory infringement of a patent shall be denied relief or deemed guilty of misuse or illegal extension of the patent right by reason of his having done one or more of the following: (1) derived revenue from acts which if performed by another without his consent would constitute contributory infringement of the patent; (2) licensed or authorized another to perform acts which if performed without his consent would constitute contributory infringement of the patent; (3) sought to enforce his patent rights against infringement or contributory infringement."

The court's attention has been called to the following cases: Dr. Salsbury's Laboratories v. I. D. Russell Co. Laboratories, D.C., 121 F.Supp. 709; Dr. Salsbury's Laboratories v. I. D. Russell Co. Laboratories, 8 Cir., 212 F.2d 414; Dr. Salsbury's Laboratories v. I. D. Russell Co. Laboratories, D.C., 97 F.Supp. 695; I. D. Russell Co. v. Dr. Salsbury's Laboratories, 8 Cir., 198 F.2d 473; Hall Laboratories, Inc., v. Spring Cotton Mills, Inc., D.C., 112 F.Supp. 29; United States v. United States Gypsum Co., D.C., 134 F.Supp. 69; Southern States Equipment Corp. v. USCO Power Equipment Corp., 5 Cir., 209 F.2d 111; Cole v. Hughes Tool Company, 10 Cir., 215 F.2d 924; Jones v. Radio Corporation of America, D.C., 131 F.Supp. 82, and to articles in Law Reviews as follows: 66 Harvard Law Review, 909; Professor S. Chesterfield Oppenheim in 54 Michigan Law Review 199.

The court has considered the statute in question, the cases and articles relating to it, and the arguments of counsel and cannot escape the conviction that it was the purpose of Congress to change the law as announced in the two Mercoid cases: Mercoid Corp. v. Mid-Continent Investment Co., 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376, and Mercoid Corp. v. Minneapolis-Honeywell Regulator Co., 320 U.S. 680, 64 S.Ct. 278, 88 L.Ed. 396, and that it did change the law as announced in those cases. One effect (indirect, perhaps) of paragraph (c) of said section is that (1) sales of that which does not constitute "a material part of the invention" and (2) sales of that which is "a staple article or commodity of commerce suitable for substantial noninfringing use" do not constitute misuse. The ballasts that the plaintiff and its licensees sell certainly are "a material part of the invention" and are not "a staple article or commodity of commerce suitable for substantial noninfringing use."

Subparagraph (d) of Section 271 is the paragraph with which we are particularly concerned at this time. It certainly makes substantial changes in the law as announced in the Mercoid cases. It seems to the court that the defendant's thesis above set forth merely shows that the plaintiff has derived revenue from acts which, if performed by another without plaintiff's consent, would constitute contributory infringement of the patent, that the plaintiff has licensed or authorized others to perform acts

which if performed without the plaintiff's consent would constitute contributory infringement of the patent, and that the plaintiff has sought to enforce its patent rights against infringement and contributory infringement. These acts are by paragraph (d) of Section 271, above quoted, declared not to be misuse of the patent right. The court holds, accordingly, that the said Act of 1952 makes proper and lawful that which under the doctrine of the Mercoid cases, above cited, would have been a misuse of the patent.

The findings of fact and the conclusions of law on the counter-claim of General Electric Company against Sola Electric Co. for infringement of Brooks Patent No. 2,562,693, issued July 31, 1951, sufficiently disclose the issues and decision in that case so that further discussion is unnecessary here.

The court is indebted to counsel on both sides for their careful and thorough preparation for trial and trial of this case.

Counsel for the defendant may prepare and, on notice and within three days, present a draft of a judgment order giving effect to the views expressed herein and in the findings of fact and conclusions of law this day filed.